**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**



| | | |
|---|---|---|
| SHARDA PARKER and JOSE IBANEZ, Individually and on Behalf of All Others Similarly Situated, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 3:16-cv-02791-M |
| FPMC SERVICES, LLC, THE MANAGEMENT COMPANY AT FOREST PARK MEDICAL CENTER, NEAL RICHARDS GROUP, LLC, NEAL RICHARDS GROUP FOREST PARK DEVELOPMENT, LLC, and GLENDONTODD CAPITAL LLC, | § § § § § § § § | |
| Defendants. | § | |

<u>**APPENDIX OF EXHIBITS IN SUPPORT OF DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND BRIEF IN SUPPORT**</u>

Defendants FPMC Services, LLC, The Management Company at Forest Park Medical Center, Neal Richards Group, LLC, Neal Richards Group Forest Park Development, LLC, and glendonTodd Capital, LLC respectfully submit their Appendix in Support of Defendants' Response in Opposition to Plaintiffs' Motion for Class Certification and Brief in Support (Dkt. 22).

| Exhibit | Description | APP. Page |
|---|---|---|
| Exhibit A | November 21, 2016, Plaintiff's Amended Original Petition | APP 001-009 |
| Exhibit B | November 21, 2016, Plaintiff's Amended Original Petition | APP 010-018 |
| Exhibit C | November 15, 2016, Plaintiff's Second Amended Original Petition | APP 019-026 |
| Exhibit D | First Amended Plan of Liquidation | APP 027-067 |
| Exhibit E | Declaration of Todd Furniss | APP 068-069 |

| Exhibit F | Declaration of Jacob Kring | APP 070-074 |
|---|---|---|
| Exhibit 1 | January 19, 2017, E-mail from J. Kring to R. Capshaw | APP 072 |
| Exhibit 2 | January 24, 2017, E-mail from P. Bossart to J. Kring | APP 073-074 |
| Exhibit G | February 24, 2016, Original Petition | APP 075-088 |
| Exhibit H | July 20, 2016, Original Petition | APP 089-100 |
| Exhibit I | November 13, 2015, Original Petition | APP 101-114 |
| Exhibit J | August 12, 2016, Order of Dismissal and Remand | APP 115-124 |

Respectfully submitted,

   /s/ Jacob B. Kring
**Jacob B. Kring**
Texas Bar No. 24062831
**Britton D. McClung**
Texas Bar No. 24060248
**Mark A. Fritsche**
Texas Bar No. 24100095

**HEDRICK KRING, PLLC**
1700 Pacific Avenue, Suite 4650
Dallas, Texas 75201
Phone:  (214) 880-9600
Fax:     (214) 481-1844
Jacob@HedrickKring.com
Britt@HedrickKring.com
Mark@HedrickKring.com

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing document has been furnished to all counsel of record in accordance with the Federal Rules of Civil Procedure this 20th day of February, 2017.

   /s/ Jacob B. Kring
Jacob B. Kring

FILED
11/21/2016 10:54:25 AM
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY

Case 3:16-cv-02791-M   Document 23   Filed 02/20/17   Page 3 of 126   PageID 288

CAUSE NO.: CC-16-00900-B

| | | |
|---|---|---|
| ERICA LOPEZ | § | COUNTY COURT AT LAW |
| | § | |
| PLAINTIFF, | § | |
| vs. | § | |
| | § | |
| TODD FURNISS, GLENDONTODD | § | |
| CAPITAL, LLC, MARY HATCHER, WADE | § | |
| N. BARKER, M.D. AND FPMC SERVICES, | § | |
| LLC, ALL INDIVIDUALLY AND D/B/A AS | § | No.: 2 |
| (1) THE MANAGEMENT COMPANY AT | § | |
| FOREST PARK MEDICAL CENTER, LLC, | § | |
| (2) THE MANAGEMENT COMPANY AT | § | |
| FOREST PARK MEDICAL CENTER II, LLC, | § | |
| (3) THE MANAGEMENT COMPANY AT | § | |
| FOREST PARK MEDICAL CENTER III, | § | |
| LLC, (4) THE MANAGEMENT COMPANY | § | |
| AT FOREST PARK MEDICAL CENTER IV, | § | |
| LLC, AND (5) FPMC SERVICES. | § | |
| | § | |
| DEFENDANTS. | § | DALLAS COUNTY, TEXAS |

## PLAINTIFF'S AMENDED ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Erica Lopez ("Plaintiff"), filing this her Amended Original Petition against Todd Furniss, Mary Hatcher and Wade N. Barker, M.D., and in support thereof, states as follows:

## I.
## EXPEDITED ACTION

1.     This case involves an amount in controversy of less than $100,000. Accordingly, the case is designated as an Expedited Action in accordance with Rule 169 Texas Rules of Civil Procedure.

EXHIBIT A

**II.**
**DISAVOWAL OF ANY RELIANCE ON ANY FEDERAL STATUTE OR LAW**

2.      Plaintiff seeks no relief under any federal statute or law.  Plaintiff asserts tort claims pursuant solely to Texas state law.

**III.**
**NATURE OF THE ACTION**

3.      This is a civil suit for damages owed to Plaintiff.  Defendants made false, deceptive and fraudulent representations and inducements that caused Plaintiff to incur damages for which Defendants are personally liable.

**IV.**
**JURISDICTION AND VENUE**

4.      This Court has jurisdiction over the Parties because the lawsuit involves claims within the jurisdictional limits of this Court.

5.       Venue is proper in Dallas County, Texas because all or a substantial part of the events giving rise to the claim occurred in Dallas County, Texas and one or more of the Defendants reside in or maintain principal offices in Dallas County, Texas.

**V.**
**PARTIES**

6.      Plaintiff Erica Lopez is a natural person residing in Texas.

7.      Defendant Todd Furniss is a natural person residing in Texas; Furniss has appeared and answered.

8.      Defendant Mary Hatcher is a natural person residing in Texas.  Hatcher has appeared and answered.

9.      Defendant Wade N. Barker, M.D. is a natural person residing in Texas.  Barker has appeared and answered.

## V.
## FACTUAL BACKGROUND

10.     This claim relates to the Forest Park Medical Center located at 11990 North Central Expressway, Dallas, Texas 75243 (the "Dallas Facility").

11.     During all relevant time periods, Todd Furniss ("Furniss"), Defendant Wade N. Barker, M.D. ("Barker"), and Defendant Mary Hatcher ("Hatcher") (collectively "the Defendants") owned, operated, controlled and/or held financial interests in (1) The Management Company at Forest Park Medical Center, LLC, (2) The Management Company at Forest Park Medical Center II, LLC, (3) The Management Company at Forest Park Medical Center III, LLC, and (4) The Management Company at Forest Park Medical Center IV, LLC. (collectively referred to herein as "The Management Company at Forest Park Medical Center").  In addition, Defendants owned, operated, controlled and/or held financial interests in FPMC Services.

12.     The Management Company at Forest Park Medical Center provided hospital management services to the Dallas Facility, including but not limited to (a) the management of payroll; (b) the continued operation of the Dallas Facility; and (c) the decisions as to what bills, accounts and debts of the Hospital would be paid and the order of payment.  FPMC Services administered payroll for the Facility's employees.

13.     Plaintiff Erica Lopez was employed by FPMC Services to work in the Dallas Facility until the Dallas Facility closed on or about October 31, 2015.  Prior to October 31, 2015, Plaintiff provided valuable services based on fraudulent inducements of Defendants.

Plaintiff sustained actual damages as a proximate result of false, misleading and deceptive inducements and omissions.  Those damages include the reasonable value of the services rendered for which payment was not made.  Additionally, Plaintiff was deprived of the opportunity to seek employment elsewhere and to seek the accrued unpaid benefits which could have been claimed but for Defendants' actual and constructive fraud.

14.     Defendants were personally involved in the day-to-day operations of the Dallas Facility.  Defendants were personally aware at all relevant times of the financial status of the Dallas Facility and the ability to remain operational.  At all times relevant to the claims asserted herein, Defendants possessed actual knowledge of the inability of the Dallas Facility to remain operational and the insolvency of The Management Company at Forest Park Medical Center.  Defendants possessed actual knowledge that despite the continued labor of employees like Plaintiff, that payment for those services would not be made.  Despite such actual knowledge, Defendants, Furniss and Hatcher, by direct individual representation and by representation through agents who were directed to provide the false information to employees like Plaintiff, directed Plaintiff and her fellow employees to continue working without disclosing that the representations of "keep going, all is well" was untrue.  At all relevant times the Defendants encouraged the employees, including Plaintiff, to continue to work, not quit and seek benefits, all so that Defendants could obtain personal gain to the detriment of Plaintiff.  Defendant Barker was at all relevant times aware that inducements were being made based on false assurance of payment but failed to disclose those facts when Barker knew such facts should have been timely and truthfully disclosed.

15.     Rather than to tell Plaintiff the truth about the operations of the Dallas Facility and in order to protect Defendants' own personal interests and further Defendants' own financial gain, the individual Defendants directly and through representatives of FPMC Services and others made false representations for the purpose of inducing Plaintiff and her co-workers to continue to come to work, perform procedures and generate revenue so as to benefit Defendants.

16.     Defendants affirmatively made misrepresentations about the operation of the Facility and ability and likelihood that Plaintiff would be paid for the services rendered. Representations were made by Defendants directly to management of FPMC Services to provide to employees like Plaintiff.

17.     Defendants utilized Plaintiff and her fellow employees to continue the operation of the Facility despite actual knowledge that there was insufficient operating capital to pay for the services of Plaintiff and other similarly situated employees.  Defendants engaged in such conduct in order to protect their personal financial interests.

18.     On or about October 31, 2015, Plaintiff and other employees employed at the Dallas Facility were notified of their immediate termination.  At time of their termination, Plaintiff and her fellow employees were advised that they would not be paid for their services nor would Plaintiff receive her accrued benefits.

## VI.
## CAUSE OF ACTION
## FRAUD

19.     Plaintiff incorporates by reference Paragraphs 1 through 18 above.

20.     Defendants personally concealed and/or expressly misrepresented either directly or through management representatives whom they directed and expected would convey that information to Plaintiff, the fact that there were insufficient assets to pay Plaintiff and her fellow employees for work and benefits after Defendants became aware of that fact. Defendants knew and were aware that there were insufficient assets to fairly and fully compensate Plaintiff and her fellow employees for services specifically requested by or at the direction of Defendants, individually.   Instead Defendants actively concealed and mislead Plaintiff so as to induce Plaintiff and her fellow employees to continue working at the Dallas Facility.   Defendants, Furniss and Hatcher had a duty of honesty by virtue of having taken affirmative actions which falsely assured employees, including Plaintiff that the Dallas Facility would continue to operate and the services rendered and accrued benefit honored with payment.   Defendant Barker had a duty by virtue of his knowledge of false representations being made to induce Plaintiff to not quit and seek benefits to disclose the true facts.   The true facts as known to Defendants were that the Dallas Facility was insolvent and payments would not be or which were false, misleading and made for services rendered or benefits accrued. The facts that were withheld by Defendants were material to Plaintiff.   Defendants knew that Plaintiff was unaware of the undisclosed facts or the untrue nature of the representations made and Plaintiff did not have an equal opportunity to discover the undisclosed facts.   By failing to disclose the truth, each of the Defendants, individually, intended to induce Plaintiff to take action or refrain from acting, including the decision not to seek benefits and to continue performance of work at the Dallas Facility in expectation of payment therefore.   Plaintiff's reliance on the false representations of Defendants caused Plaintiff to incur actual damages.

## VII.
## PUNITIVE DAMAGES

21.     Defendants' conduct as outlined herein was committed knowingly and with malice.  Defendants had a specific intent to cause injury to Plaintiff by virtue of the false and misleading information they released.

22.     The false representations made by Defendants as outlined herein were made by Defendants with full knowledge of the risk of a negative financial impact to Plaintiff. Defendants had actual subjective awareness of the risk created by Defendants' conduct but nevertheless proceeded with conduct that impacted the rights, safety, and welfare of Plaintiff. Because of the foregoing, Plaintiff seeks the award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests and prays for judgment against the Defendants for:

1)      actual damages;

2)      punitive damages; and

3)      such other relief as the Court deems fair and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff hereby request trial by jury of all issues triable by jury.

DATED this 21st day of November, 2016.

Respectfully submitted,

**CAPSHAW & ASSOCIATES**
3500 Maple Avenue, Suite 1100
Dallas, Texas 75219
214.761.6610  214.761-6611 (F)

By:     _____
Richard A. Capshaw
State Bar No. 03783800
richard@capslaw.com

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

On November 21st 2016, I electronically submitted the foregoing document with the clerk of court for Dallas County Court at Law No. 2, Dallas, Texas, using the electronic case filing system of the court.  I hereby certify that I have served all counsel of record electronically or by another manner authorized by the Texas Rules of Civil Procedure.

Jacob B. Kring
**HEDRICK KRING, PLLC**
1700 Pacific Avenue, Suite 4650
Dallas, Texas 75201
Phone:  (214) 880-9600
Fax:  (214) 481-1844
Jacob@HedrickKring.com


By:  _____
          Richard A. Capshaw

CAUSE NO.: CC-16-03579-C

| | | |
|---|---|---|
| JANET MAYES, | § | COUNTY COURT AT LAW |
| | § | |
| PLAINTIFF, | § | |
| vs. | § | |
| | § | |
| TODD FURNISS, GLENDONTODD | § | |
| CAPITAL, LLC, MARY HATCHER, WADE | § | |
| N. BARKER, M.D. AND FPMC SERVICES, | § | |
| LLC, ALL INDIVIDUALLY AND D/B/A AS | § | No.: 3 |
| (1) THE MANAGEMENT COMPANY AT | § | |
| FOREST PARK MEDICAL CENTER, LLC, | § | |
| (2) THE MANAGEMENT COMPANY AT | § | |
| FOREST PARK MEDICAL CENTER II, LLC, | § | |
| (3) THE MANAGEMENT COMPANY AT | § | |
| FOREST PARK MEDICAL CENTER III, | § | |
| LLC, (4) THE MANAGEMENT COMPANY | § | |
| AT FOREST PARK MEDICAL CENTER IV, | § | |
| LLC, AND (5) FPMC SERVICES. | § | |
| | § | |
| DEFENDANTS. | § | DALLAS COUNTY, TEXAS |

## PLAINTIFF'S AMENDED ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Janet Mayes ("Plaintiff"), filing this her Amended Original Petition against Todd Furniss, Mary Hatcher and Wade N. Barker, M.D., and in support thereof, states as follows:

## I.
## EXPEDITED ACTION

1.     This case involves an amount in controversy of less than $100,000. Accordingly, the case is designated as an Expedited Action in accordance with Rule 169 Texas Rules of Civil Procedure.

*PLAINTIFF'S AMENDED ORIGINAL PETITION*                                                    *– PAGE 1*



## II.
## DISAVOWAL OF ANY RELIANCE ON ANY FEDERAL STATUTE OR LAW

2.      Plaintiff seeks no relief under any federal statute or law.  Plaintiff asserts tort claims pursuant solely to Texas state law.

## III.
## NATURE OF THE ACTION

3.      This is a civil suit for damages owed to Plaintiff.  Defendants made false, deceptive and fraudulent representations and inducements that caused Plaintiff to incur damages for which Defendants are personally liable.

## IV.
## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the Parties because the lawsuit involves claims within the jurisdictional limits of this Court.

5.       Venue is proper in Dallas County, Texas because all or a substantial part of the events giving rise to the claim occurred in Dallas County, Texas and one or more of the Defendants reside in or maintain principal offices in Dallas County, Texas.

## V.
## PARTIES

6.      Plaintiff Janet Mayes is a natural person residing in Texas.

7.      Defendant Todd Furniss is a natural person residing in Texas; Furniss has appeared and answered.

8.      Defendant Mary Hatcher is a natural person residing in Texas.  Hatcher has appeared and answered.

9.    Defendant Wade N. Barker, M.D. is a natural person residing in Texas.  Barker has appeared and answered.

## V.
## FACTUAL BACKGROUND

10.    This claim relates to the Forest Park Medical Center located at 11990 North Central Expressway, Dallas, Texas 75243 (the "Dallas Facility").

11.    During all relevant time periods, Todd Furniss ("Furniss"), Defendant Wade N. Barker, M.D. ("Barker"), and Defendant Mary Hatcher ("Hatcher") (collectively "the Defendants") owned, operated, controlled and/or held financial interests in (1) The Management Company at Forest Park Medical Center, LLC, (2) The Management Company at Forest Park Medical Center II, LLC, (3) The Management Company at Forest Park Medical Center III, LLC, and (4) The Management Company at Forest Park Medical Center IV, LLC. (collectively referred to herein as "The Management Company at Forest Park Medical Center").  In addition, Defendants owned, operated, controlled and/or held financial interests in FPMC Services.

12.    The Management Company at Forest Park Medical Center provided hospital management services to the Dallas Facility, including but not limited to (a) the management of payroll; (b) the continued operation of the Dallas Facility; and (c) the decisions as to what bills, accounts and debts of the Hospital would be paid and the order of payment.  FPMC Services administered payroll for the Facility's employees.

13.    Plaintiff Janet Mayes was employed by FPMC Services to work in the Dallas Facility until the Dallas Facility closed on or about October 31, 2015.  Prior to October 31, 2015, Plaintiff provided valuable services based on fraudulent inducements of Defendants.

Plaintiff sustained actual damages as a proximate result of false, misleading and deceptive inducements and omissions. Those damages include the reasonable value of the services rendered for which payment was not made. Additionally, Plaintiff was deprived of the opportunity to seek employment elsewhere and to seek the accrued unpaid benefits which could have been claimed but for Defendants' actual and constructive fraud.

14.    Defendants were personally involved in the day-to-day operations of the Dallas Facility. Defendants were personally aware at all relevant times of the financial status of the Dallas Facility and the ability to remain operational. At all times relevant to the claims asserted herein, Defendants possessed actual knowledge of the inability of the Dallas Facility to remain operational and the insolvency of The Management Company at Forest Park Medical Center. Defendants possessed actual knowledge that despite the continued labor of employees like Plaintiff, that payment for those services would not be made. Despite such actual knowledge, Defendants, Furniss and Hatcher, by direct individual representation and by representation through agents who were directed to provide the false information to employees like Plaintiff, directed Plaintiff and her fellow employees to continue working without disclosing that the representations of "keep going, all is well" was untrue. At all relevant times the Defendants encouraged the employees, including Plaintiff, to continue to work, not quit and seek benefits, all so that Defendants could obtain personal gain to the detriment of Plaintiff. Defendant Barker was at all relevant times aware that inducements were being made based on false assurance of payment but failed to disclose those facts when Barker knew such facts should have been timely and truthfully disclosed.

15.     Rather than to tell Plaintiff the truth about the operations of the Dallas Facility and in order to protect Defendants' own personal interests and further Defendants' own financial gain, the individual Defendants directly and through representatives of FPMC Services and others made false representations for the purpose of inducing Plaintiff and her co-workers to continue to come to work, perform procedures and generate revenue so as to benefit Defendants.

16.     Defendants affirmatively made misrepresentations about the operation of the Facility and ability and likelihood that Plaintiff would be paid for the services rendered. Representations were made by Defendants directly to management of FPMC Services to provide to employees like Plaintiff.

17.     Defendants utilized Plaintiff and her fellow employees to continue the operation of the Facility despite actual knowledge that there was insufficient operating capital to pay for the services of Plaintiff and other similarly situated employees.  Defendants engaged in such conduct in order to protect their personal financial interests.

18.     On or about October 31, 2015, Plaintiff and other employees employed at the Dallas Facility were notified of their immediate termination.  At time of their termination, Plaintiff and her fellow employees were advised that they would not be paid for their services nor would Plaintiff receive her accrued benefits.

## VI.
## CAUSE OF ACTION
## FRAUD

19.     Plaintiff incorporates by reference Paragraphs 1 through 18 above.

20.     Defendants personally concealed and/or expressly misrepresented either directly or through management representatives whom they directed and expected would convey that information to Plaintiff, the fact that there were insufficient assets to pay Plaintiff and her fellow employees for work and benefits after Defendants became aware of that fact. Defendants knew and were aware that there were insufficient assets to fairly and fully compensate Plaintiff and her fellow employees for services specifically requested by or at the direction of Defendants, individually.   Instead Defendants actively concealed and mislead Plaintiff so as to induce Plaintiff and her fellow employees to continue working at the Dallas Facility.   Defendants, Furniss and Hatcher had a duty of honesty by virtue of having taken affirmative actions which falsely assured employees, including Plaintiff that the Dallas Facility would continue to operate and the services rendered and accrued benefit honored with payment.   Defendant Barker had a duty by virtue of his knowledge of false representations being made to induce Plaintiff to not quit and seek benefits to disclose the true facts.   The true facts as known to Defendants were that the Dallas Facility was insolvent and payments would not be or which were false, misleading and made for services rendered or benefits accrued. The facts that were withheld by Defendants were material to Plaintiff.   Defendants knew that Plaintiff was unaware of the undisclosed facts or the untrue nature of the representations made and Plaintiff did not have an equal opportunity to discover the undisclosed facts.   By failing to disclose the truth, each of the Defendants, individually, intended to induce Plaintiff to take action or refrain from acting, including the decision not to seek benefits and to continue performance of work at the Dallas Facility in expectation of payment therefore.   Plaintiff's reliance on the false representations of Defendants caused Plaintiff to incur actual damages.

## VII.
## PUNITIVE DAMAGES

21.     Defendants' conduct as outlined herein was committed knowingly and with malice.  Defendants had a specific intent to cause injury to Plaintiff by virtue of the false and misleading information they released.

22.     The false representations made by Defendants as outlined herein were made by Defendants with full knowledge of the risk of a negative financial impact to Plaintiff. Defendants had actual subjective awareness of the risk created by Defendants' conduct but nevertheless proceeded with conduct that impacted the rights, safety, and welfare of Plaintiff. Because of the foregoing, Plaintiff seeks the award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests and prays for judgment against the Defendants for:

1)      actual damages;

2)      punitive damages; and

3)      such other relief as the Court deems fair and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff hereby request trial by jury of all issues triable by jury.

DATED this 21st day of November, 2016.

Respectfully submitted,

**CAPSHAW & ASSOCIATES**
3500 Maple Avenue, Suite 1100
Dallas, Texas 75219
214.761.6610  214.761-6611 (F)

By: _____
Richard A. Capshaw
State Bar No. 03783800
richard@capslaw.com

**ATTORNEYS FOR PLAINTIFF**

## **CERTIFICATE OF SERVICE**

On November 21st 2016, I electronically submitted the foregoing document with the clerk of court for Dallas County Court at Law No. 3, Dallas, Texas, using the electronic case filing system of the court.   I hereby certify that I have served all counsel of record electronically or by another manner authorized by the Texas Rules of Civil Procedure.

Jacob B. Kring
**HEDRICK KRING, PLLC**
1700 Pacific Avenue, Suite 4650
Dallas, Texas 75201
Phone:  (214) 880-9600
Fax:  (214) 481-1844
Jacob@HedrickKring.com


By: _____
       Richard A. Capshaw

CAUSE NO.: CC-15-05764-C

| | | |
|---|---|---|
| LAURA GURGANUS | § | COUNTY COURT AT LAW |
| | § | |
| PLAINTIFF, | § | |
| vs. | § | |
| | § | |
| TODD FURNISS, GLENDONTODD | § | |
| CAPITAL, LLC, MARY HATCHER, WADE | § | |
| N. BARKER, M.D. AND FPMC SERVICES, | § | |
| LLC, ALL INDIVIDUALLY AND D/B/A AS | § | |
| (1) THE MANAGEMENT COMPANY AT | § | No. 3 |
| FOREST PARK MEDICAL CENTER, LLC, | § | |
| (2) THE MANAGEMENT COMPANY AT | § | |
| FOREST PARK MEDICAL CENTER II, LLC, | § | |
| (3) THE MANAGEMENT COMPANY AT | § | |
| FOREST PARK MEDICAL CENTER III, | § | |
| LLC, (4) THE MANAGEMENT COMPANY | § | |
| AT FOREST PARK MEDICAL CENTER IV, | § | |
| LLC, AND (5) FPMC SERVICES. | § | |
| | § | |
| DEFENDANTS. | § | DALLAS COUNTY, TEXAS |

## PLAINTIFF'S SECOND AMENDED ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Laura Gurganus ("Plaintiff"), filing this her Second Amended Original Petition against Todd Furniss, Mary Hatcher and Wade N. Barker, M.D., and in support thereof, states as follows:

## I.
## EXPEDITED ACTION

1.     This case involves an amount in controversy of less than $100,000. Accordingly, the case is designated as an Expedited Action in accordance with Rule 169 Texas Rules of Civil Procedure.

*PLAINTIFF'S SECOND AMENDED ORIGINAL PETITION*                                                    *– PAGE 1*



EXHIBIT C                                                                                              APP 019

**II.**
**DISAVOWAL OF ANY RELIANCE ON ANY FEDERAL STATUTE OR LAW**

2.     Plaintiff seeks no relief under any federal statute or law.  Plaintiff asserts tort claims pursuant solely to Texas state law.

**III.**
**NATURE OF THE ACTION**

3.     This is a civil suit for damages owed to Plaintiff.  Defendants made false, deceptive and fraudulent representations and inducements that caused Plaintiff to incur damages for which Defendants are personally liable.

**IV.**
**JURISDICTION AND VENUE**

4.     This Court has jurisdiction over the Parties because the lawsuit involves claims within the jurisdictional limits of this Court.

5.      Venue is proper in Dallas County, Texas because all or a substantial part of the events giving rise to the claim occurred in Dallas County, Texas and one or more of the Defendants reside in or maintain principal offices in Dallas County, Texas.

**V.**
**PARTIES**

6.     Plaintiff Laura Gurganus is a natural person residing in Texas.

7.     Defendant Todd Furniss is a natural person residing in Texas; Furniss has appeared and answered.

8.     Defendant Mary Hatcher is a natural person residing in Texas.  Hatcher has appeared and answered.

9.     Defendant Wade N. Barker, M.D. is a natural person residing in Texas.  Barker has appeared and answered.

## V.
## FACTUAL BACKGROUND

10.    This claim relates to the Forest Park Medical Center located at 11990 North Central Expressway, Dallas, Texas 75243 (the "Dallas Facility").

11.    During all relevant time periods, Todd Furniss ("Furniss"), Defendant Wade N. Barker, M.D. ("Barker"), and Defendant Mary Hatcher ("Hatcher") (collectively "the Defendants") owned, operated, controlled and/or held financial interests in (1) The Management Company at Forest Park Medical Center, LLC, (2) The Management Company at Forest Park Medical Center II, LLC, (3) The Management Company at Forest Park Medical Center III, LLC, and (4) The Management Company at Forest Park Medical Center IV, LLC. (collectively referred to herein as "The Management Company at Forest Park Medical Center").  In addition, Defendants owned, operated, controlled and/or held financial interests in FPMC Services.

12.    The Management Company at Forest Park Medical Center provided hospital management services to the Dallas Facility, including but not limited to (a) the management of payroll; (b) the continued operation of the Dallas Facility; and (c) the decisions as to what bills, accounts and debts of the Hospital would be paid and the order of payment.  FPMC Services administered payroll for the Facility's employees.

13.    Plaintiff Laura Gurganus was employed by FPMC Services to work in the Dallas Facility until the Dallas Facility closed on or about October 31, 2015.  Prior to October 31, 2015, Plaintiff provided valuable services based on fraudulent inducements of Defendants.

Plaintiff sustained actual damages as a proximate result of false, misleading and deceptive inducements. Those damages include the reasonable value of the services rendered for which payment was not made. Additionally, Plaintiff was deprived of the opportunity to seek employment elsewhere and to seek the accrued unpaid benefits which could have been claimed but for Defendants' actual and constructive fraud.

14.     Defendants were personally involved in the day-to-day operations of the Dallas Facility. Defendants were personally aware at all relevant times of the financial status of the Dallas Facility and the ability to remain operational. At all times relevant to the claims asserted herein, Defendants possessed actual knowledge of the inability of the Dallas Facility to remain operational and the insolvency of The Management Company at Forest Park Medical Center. Defendants possessed actual knowledge that despite the continued labor of employees like Plaintiff, that payment for those services would not be made. Despite such actual knowledge, Defendants, by direct individual representation and by representation through agents, directed Plaintiff and her fellow employees to continue working without disclosing that the representations of "keep going, all is well" was untrue. At all relevant times the Defendants encouraged the employees, including Plaintiff, to continue to work, not quit and seek benefits, all so that Defendants could obtain personal gain to the detriment of Plaintiff.

15.     Rather than to tell Plaintiff the truth about the operations of the Dallas Facility and in order to protect the Defendants' own personal interests and further their own financial gain, the individual Defendants directly and through representatives of FPMC Services made false representations for the purpose of inducing Plaintiff and her co-workers to continue to come to work, perform procedures and generate revenue so as to benefit Defendants.

16.     The Defendants affirmatively made misrepresentations about the operation of the Facility and ability and likelihood that Plaintiff would be paid for the services rendered. Representations were made by Defendants directly to management of FPMC Services to provide to employees like Plaintiff.

17.     The Defendants utilized Plaintiff and her fellow employees to continue the operation of the Facility despite actual knowledge that there was insufficient operating capital to pay for the services of Plaintiff and other similarly situated employees.  Defendants engaged in such conduct in order to protect their personal financial interests.

18.     On or about October 31, 2015, Plaintiff and other employees employed at the Dallas Facility were notified of their immediate termination.  At time of their termination, Plaintiff and her fellow employees were advised that they would not be paid for their services nor would Plaintiff receive her accrued benefits.

## VI.
## CAUSE OF ACTION
## FRAUD

19.     Plaintiff incorporates by reference Paragraphs 1 through 18 above.

20.     The Defendants personally concealed and/or expressly misrepresented either directly or through management representatives whom they directed and expected would convey that information to Plaintiff the fact that there were insufficient assets to pay Plaintiff and her fellow employees for work and benefits after Defendants became aware of that fact. The Defendants knew and were aware that there were insufficient assets to fairly and fully compensate Plaintiff and her fellow employees for services specifically requested by or at the direction of Defendants, individually.   Instead Defendants actively concealed and mislead

Plaintiff so as to induce Plaintiff and her fellow employees to continue working at the Dallas Facility.  Defendants each had a duty of honesty by virtue of having taken affirmative actions which falsely assured employees, including Plaintiff, that the Dallas Facility would continue to operate and the services rendered and accrued benefit honored with payment.  The true facts as known to Defendants were that the Dallas Facility was insolvent and payments would not be made for services rendered or benefits accrued.  The facts that were withheld by Defendants were material to Plaintiff.  Defendants knew that Plaintiff was unaware of the undisclosed facts or the untrue nature of the representations made and Plaintiff did not have an equal opportunity to discover the undisclosed facts.  By failing to disclose the truth, each of the Defendants, individually, intended to induce Plaintiff to take action or refrain from acting, including the decision not to seek benefits and to continue performance of work at the Dallas Facility in expectation of payment therefore.  Plaintiff's reliance on the false representations of Defendants caused Plaintiff to incur actual damages.

## VII.
## <u>PUNITIVE DAMAGES</u>

21.    Defendants' conduct as outlined herein was committed knowingly and with malice.  Defendants had a specific intent to cause injury to Plaintiff by virtue of the false and misleading information they released.

22.    The false representations made by Defendants as outlined herein were made by Defendants with full knowledge of the risk of a negative financial impact to Plaintiff.  Defendants had actual subjective awareness of the risk created by Defendants' conduct but nevertheless proceeded with conduct that impacted the rights, safety, and welfare of Plaintiff.  Because of the foregoing, Plaintiff seeks the award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests and prays

for judgment against the Defendants for:

1)      actual damages;

2)      punitive damages; and

3)      such other relief as the Court deems fair and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff hereby request trial by jury of all issues triable by jury.

DATED this 15th day of November, 2016.

Respectfully submitted,

**CAPSHAW & ASSOCIATES**
3500 Maple Avenue, Suite 1100
Dallas, Texas 75219
214.761.6610  214.761-6611 (F)

By:     _____
        Richard A. Capshaw
        State Bar No. 03783800
        richard@capslaw.com

        **ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

On November 15, 2016, I electronically submitted the foregoing document with the clerk of court for Dallas County Court at Law No. 3, Dallas, Texas, using the electronic case filing system of the court.  I hereby certify that I have served all counsel of record electronically or by another manner authorized by the Texas Rules of Civil Procedure.

Jacob B. Kring
**HEDRICK KRING, PLLC**
1700 Pacific Avenue, Suite 4650
Dallas, Texas 75201
Phone:  (214) 880-9600
Fax:  (214) 481-1844
Jacob@HedrickKring.com


By: _____
         Richard A. Capshaw

**Howard Marc Spector**
**TBA # 00785023**
**SPECTOR & JOHNSON, PLLC**
**12770 Coit Road, Suite 1100**
**Dallas, Texas 75251**
**(214) 365-5377**
**FAX: (214) 237-3380**
**EMAIL: hspector@spectorjohnson.com**

**COUNSEL FOR THE DEBTOR**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 16-40302** |
| **FOREST PARK MEDICAL CENTER, LLC,** | § | |
| | § | |
| **DEBTOR.** | § | **CHAPTER 11** |

**FIRST AMENDED PLAN OF LIQUIDATION UNDER**
**CHAPTER 11 OF THE BANKRUPTCY CODE**

      Forest Park Medical Center, LLC, as the debtor and debtor in possession in the above-captioned Chapter 11 Case, hereby respectfully proposes the following First Amended Plan of Liquidation Under Chapter 11 of the Bankruptcy Code, thereby amending the Original Plan of Liquidation Under Chapter 11 of the Bankruptcy Code, filed by the Debtor on October 4, 2016 [Docket No. 238].

**ARTICLE I**

**RULES OF INTERPRETATION, COMPUTATION OF**
**TIME, GOVERNING LAW AND DEFINED TERMS**

*A.*    *Rules of Interpretation, Computation of Time and Governing Law*

      1.    For purposes of this document: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles" or "sections" are references to Articles or "sections" hereof or hereto; (e) unless

---

# EXHIBIT D

APP 027

otherwise stated, the words ''herein,'' "hereof" and ''hereto'' refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (h) any term used in capitalized form herein that is not otherwise defined, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

2.      The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

3.      Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas, without giving effect to the principles of conflict of laws thereof.

B.      *Defined Terms*

As used in this Plan, capitalized terms have the meanings set forth below.

1.      "*Ad Valorem Taxing Authorities*" means any governmental entity entitled by law to assess taxes on property based upon the value of such property and to take a statutory Lien senior to Liens filed of record to secure the payment of such taxes and interest accruing thereon.

2.      "*Administrative Claims*" means Claims that have been timely Filed before the applicable Administrative Claims Bar Date for costs and expenses of administration under sections 507(a)(2) or 1114(e)(2) of the Bankruptcy Code, or that have been allowed by a separate order of the Bankruptcy Court.

3.      "*Administrative Claims Bar Date*" means (i) a date thirty (30) days after the Effective Date with respect to Administrative Claims arising after September 30, 2016 and (ii) November 15, 2016 with respect to Administrative Claims arising through and including September 30, 2016.

4.      "*Administrative Claim Bar Date Order*" means that certain Order Establishing Deadline for Filing Requests for Payment of Administrative Expense Claims [Docket No. 243] entered by the Bankruptcy Court on October 6, 2016.

5.      "*Allowed*" means, with respect to any Claim, and except as otherwise provided herein, a Claim that: (a) the Debtor scheduled in a liquidated, undisputed and non-contingent amount; (b) is evidenced by a valid Proof of Claim and as to which the Debtor or other party in interest has not Filed an objection by the Claims Objection Bar Date; or (c) is Allowed pursuant to this Plan or any stipulation approved by, or order of, the Bankruptcy Court.  Provided however, that no Claim in (a) or (b) shall be finally Allowed until the passing of the Claims

Objection Bar Date, irrespective of whether the Holder of such Claim is entitled to vote on the Plan or is entitled to a Distribution under the Plan.

6.      "*Assets*" means all of the rights, title and interest of the Debtor in, to and under any and all of its remaining assets and property, whether tangible, intangible, real or personal, of any nature whatsoever, including all property of the Estate under and pursuant to section 541 of the Bankruptcy Code, including Cash, the Causes of Action, rights and interests in property, and files, books and records of the Estate, specifically excluding the HCA Proceeds.

7.      "*Ballot*" means such ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote on this Plan shall, among other things, indicate their acceptance or rejection of this Plan in accordance with this Plan and the procedures governing the solicitation process.

8.      "*Bankruptcy Code*" means title 11 of the United States Code, as may be amended from time to time.

9.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Eastern District of Texas, Sherman Division.

10.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to this Chapter 11 Case and the Bankruptcy Court's local rules.

11.      "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" as defined in Bankruptcy Rule 9006(a).

12.     *"Callidus"* means Callidus Capital Corporation.

13.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

14.     "*Causes of Action*" means and includes (i) any and all avoidance, recovery, surcharge, subordination or other actions or remedies that may be brought on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable non- bankruptcy law, including actions or remedies under sections 506, 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code; and (ii) all other actions, causes of action, claims, liabilities, obligations,  rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third-party claims, indemnity claims, contribution claims or any other claims of the Debtor or the Estate, whether Disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing as of the Effective Date or thereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of this Chapter 11 Case, including through the Effective Date.

15.     "*Certificate*" means any instrument evidencing an Equity Interest.

16.    "*Chapter 11 Case*" means this chapter 11 case captioned, *In re: Forest Park Medical Center, LLC, Debtor;* Case No. 16-40302.

17.    "*Claims Objection Bar Date*" means the deadline for objecting to Claims, which shall be the date that is sixty (60) days after the Effective Date, unless extended by an order of the Bankruptcy Court upon notice and a hearing.

18.    "*Claims Register*" means the claims register maintained by the Voting and Claims Agent.

19.    "*Class*" means a category of Holders of Claims or Equity Interests pursuant to section 1122(a) of the Bankruptcy Code.

20.    "*Class 1*" shall have such meaning set forth in Article III, Section B.1 of the Plan.

21.    "*Class 1 Election*" means a vote indicated on the Ballot of the Holder of a Class 1 Claim affirmatively opting to (i) receive the additional Distributions as described in Article III, Section B.1.c of this Plan and (ii) grant the Class 1 Release.

22.    "*Class 1 Release*" means the unconditional release by each Holder of a Class 1 Claim (each such Holder having made the Class 1 Election) of the Debtor and the Related Parties from all Claims of each such Holder which are indirectly or directly related to the Holder's rendition of personal services to or for the benefit of the Debtor, whether or not arising out of such Holder's employment or independent contractor relationship with the Debtor or the Other Entities including, but not limited to, the following claims:

     a.  Violation of the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. and its implementing regulations, codified at 20 C.F.R. § 639 et seq;
     b.  Termination without cause;
     c.  Wages and benefits, paid or unpaid;
     d.  Civil penalties;
     e.  Attorneys' fees;
     f.  Breach of contract;
     g.  Quantum Meruit;
     h.  Restitution;
     i.  Claims made in the Northern District Proceedings; and
     j.  Pre- and post-judgment interest.

23.    "*Class 2*" shall have such meaning set forth in Article III, Section B.2 of the Plan.

24.    "*Class 3*" shall have such meaning set forth in Article III, Section B.3 of the

Plan.

25.    "*Class 4*" shall have such meaning set forth in Article III, Section B.4 of the Plan.

26.    "*Conditional Lift Stay Orders*" means that certain (i) Order Modifying the Stay Provided For In 11 U.S.C. § 362 On An Interim Basis [Docket No. 233], entered by the Bankruptcy Court on September 27, 2016; (ii) Order Approving Agreement Modifying or Terminating the Stay Provided For In 11 U.S.C. § 362 Pursuant to Federal Rule of Bankruptcy Procedure 4001(d) – Banc of America Leasing & Capital, LLC [Docket No. 246] entered by the Bankruptcy Court on October 11, 2016; (iii) Order Approving Agreement Modifying or Terminating the Stay Provided For In 11 U.S.C. § 362 Pursuant to Federal Rule of Bankruptcy Procedure 4001(d) – Med One Capital Funding, LLC [Docket No. 251] entered by the Bankruptcy Court on October 11, 2016; (iv) Order Approving Agreement Modifying or Terminating the Stay Provided For In 11 U.S.C. § 362 Pursuant to Federal Rule of Bankruptcy Procedure 4001(d) – Wells Fargo Equipment Finance, Inc. [Docket No. 250] entered by the Bankruptcy Court on October 11, 2016; (v) Order Approving Agreement Modifying or Terminating the Stay Provided For In 11 U.S.C. § 362 Pursuant to Federal Rule of Bankruptcy Procedure 4001(d) – GE HFS, LLC [Docket No. 249] entered by the Bankruptcy Court on October 11, 2016; (vi) Order Approving Agreement Modifying or Terminating the Stay Provided For In 11 U.S.C. § 362 Pursuant to Federal Rule of Bankruptcy Procedure 4001(d) – Everbank Commercial Finance [Docket No. 248] entered by the Bankruptcy Court on October 11, 2016; and (vii) Order Approving Agreement Modifying or Terminating the Stay Provided For In 11 U.S.C. § 362 Pursuant to Federal Rule of Bankruptcy Procedure 4001(d) – Bank of the West [Docket No. 247] entered by the Bankruptcy Court on October 11, 2016.

27.    "*Confirmation*" means the entry of the Confirmation Order on the docket of this Chapter 11 Case, subject to satisfaction or waiver of all conditions specified therein.

28.    "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of this Chapter 11 Case within the meaning of Bankruptcy Rules 5003 and 9021.

29.    "*Confirmation Hearing*" means the hearing before the Bankruptcy Court on the motion for entry of the Confirmation Order.

30.    "*Confirmation Order*" means the order of the Bankruptcy Court, in form and substance reasonably satisfactory to the Debtor, that shall, among other things, confirm this Plan pursuant to section 1129 of the Bankruptcy Code and approve the Estate Allocation.

31.    "*Consenting Secured Creditors*" means (i) Bank of America Leasing and Capital, LLC; (ii) Bank of the West; (iii) GE HFS (aka General Electric Healthcare); (iv) Everbank Commercial Finance; (v) MedOne Capital Funding, LLC and Republic Bank; and (vi) Wells Fargo Equipment Finance.

32.    "*Consenting Secured Creditors' Carve-Out*" means the amount of the carve-outs

provided by each of the Consenting Secured Creditors in connection with their agreements with the Debtor and the Conditional Lift Stay Orders.

33.     "*Contributed Class 1 Amount*" means a portion of the FP III Distribution equal to the amount necessary to make the Distributions to Allowed Class 1 Claims in accordance with this Plan.

34.     "*Contributed Class 3 Amount*" means a portion of the FP III Distribution equal to the amount necessary to make the Distributions to Allowed Class 3 Claims in accordance with this Plan.

35.     "*Debtor*" or "*Debtor in Possession*" means Forest Park Medical Center, LLC.

36.     "*Disclosure Statement*" means the disclosure statement relating to this Plan, as amended, supplemented or modified from time to time, including all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

37.     "*Disclosure Statement Order*" means the Final Order of the Bankruptcy Court approving the Disclosure Statement.

38.     "*Disputed*" means, with respect to any Claim or Equity Interest, any Claim or Equity Interest: listed on the Schedules as unliquidated, Disputed or contingent, unless a Proof of Claim has been timely Filed; as to which the Debtor has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules; or (c) otherwise Disputed by the Debtor in accordance with applicable law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order.

39.     "*Disputed Claim*" means any Claim that is not yet Allowed.

40.     "*Disputed Claims Reserve*" means the reserve established from the Assets and maintained or the Plan Administrator, as applicable, to hold Cash to be distributed to Holders of Allowed Claims pending resolution of Disputed Claims.

41.     "*Distribution*" means the distribution of Cash by the Plan Administrator in accordance with this Plan.

42.     "*Distribution Date*" means the date on which a Distribution is effectuated.

43.     "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions precedent to the Effective Date have been either satisfied or waived.

44.      "*Equity Interest*" means any membership interest or other instrument evidencing an ownership interest in the Debtor, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interest in the Debtor that existed

immediately prior to the Effective Date.  Equity Interests includes, but is not limited to class A, F and P membership interests.

45.      "*Estate*" means the estate of the Debtor created on the Petition Date by section 541 of the Bankruptcy Code.

46.      "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection pursuant to section 365 of the Bankruptcy Code.

47.      "*File*" or "*Filed*" means any pleading that has been entered on the docket of this Chapter 11 Case and properly served in accordance with the Bankruptcy Rules.

48.      "*Final Order*" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the subject matter, as entered on the docket in this Chapter 11 Case or the docket of any court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument or rehearing has passed without any such appeal, petition for certiorari or motion, or as to which any appeal that has been taken or any petition for certiorari or motion for a new trial, reargument or rehearing that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing will have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

49.      "*Financing Claim*" shall mean that certain Allowed Claim of David Genecov in consideration of the post-petition financing provided by David Genecov, which claim was Allowed pursuant to that certain Order of the Bankruptcy Court, entered on June 6, 2016 (Docket No. 144).

50.      "*FP III*" shall mean Forest Park Realty Partners III, LP.

51.      "*FP III Distribution*" means the Distribution to FP III on account of its Allowed Administrative Claim.

52.      "*General Bar Date*" means June 16, 2016.

53.      "*General Unsecured Claims*" means Claims against the Debtor that are not Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, or Secured Claims.

54.      "*Governmental Bar Date*" means, August 19, 2016.

55.      "*HCA*" means Columbia Hospital at Medical City Dallas Subsidiary, a Texas limited partnership, or any of its affiliates.

56.      "*HCA Proceeds*" means the $1.7 million paid by HCA to (i) pay the outstanding ad valorem personal property taxes owing against the Debtor's personal property assets; and (ii)

otherwise fund the Plan.

57.      "*Holder*" means the beneficial holder of a Claim or Equity Interest, and, when used in conjunction with a Class or type of Claim or Equity Interest, the beneficial holder of a Claim or Equity Interest in such Class or of such type.

58.      "*Hospital Landlords*" means FP III and BT Forest Park Realty Partners, LP

59.      "*HTA Landlords*" means HTA – FP Pavilion, LLC and HTA – FP Tower, LLC, each a Delaware limited liability company.

60.      "*Impaired*" means, with respect to a Class of Claims or Equity Interests, a Class of Claims or Equity Interests that is not Unimpaired.

61.      "*Local Bankruptcy Rules*" means the Local Bankruptcy Rules for the Bankruptcy Court.

62.      "*Northern District Proceedings*" means the civil proceedings pending (i) in the United States District Court for the Northern District of Texas, Dallas Division under Case No. 3:16-cv-2791 and styled *Sharda Parker and Jose Ibanez, Individually and on Behalf of All Others Similarly Situated, v. FPMC Services, LLC, The Management Company at Forest Park Medical Center, Neal Richards Group, LLC, Neal Richards Group Forest Park Development, LLC, and glendontodd Capital LLC;* and (ii) in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division under Adversary Proceeding No. 15-03139 and styled *Sharda Parker and Jose Ibanez, Individually and on Behalf of All Others Similarly Situated, v. Forest Park Realty Partners III, LP.*

63.      "*Other Entities*" means (i) the Hospital Landlords; (ii) FPMC Services, LLC; (iii) The Management Company at Forest Park Medical Center; (iv) Neal Richards Group, LLC; (v) Neal Richards Group Forest Park Development, LLC; (vi) glendonTodd Capital, LLC; and (vii) Vibrant Healthcare, LLC.

64.      "*Petition Date*" means February 21, 2016, the date on which the Debtor Filed this Chapter 11 Case.

65.      "*Plan*" means this plan of liquidation under chapter 11 of the Bankruptcy Code, either in its present form or as it may be altered, amended, modified or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules or herewith, as the case may be.

66.      "*Plan Administrator*" shall be Bob Schleizer or such other Person or Entity retained who shall serve to perform the duties of the position described in this Plan.

67.      "*Priority Claims*" means, collectively, Priority Non-Tax Claims and Priority Tax Claims.

68.      "*Priority Non-Tax Claim*" means any Claim, other than an Administrative Claim

or a Priority Tax Claim, entitled to priority payment under section 507(a) of the Bankruptcy Code.

69.    "*Priority Tax Claims*" means any and all Claims of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

70.    "*Professional*" means an Entity: (a) retained in this Chapter 11 Case pursuant to a Final Order in accordance with sections 327 of the Bankruptcy Code, and that is compensated for services rendered prior to the Effective Date pursuant to sections 327, 328, 329, 330 and 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been allowed by Final Order of the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

71.    "*Professional Fee Claim*" means any Administrative Claim for the compensation of a Professional, and the reimbursement of expenses incurred by such Professional, through and including the Effective Date.

72.    "*Proof of Claim*" means a proof of Claim Filed against the Debtor in this Chapter 11 Case.

73.    "*Pro Rata*" means the proportion that (a) the Allowed amount of a Claim in a particular Class (or several Classes taken as a whole) bears to (b) the aggregate Allowed amount of all Claims in such Class (or several Classes taken as a whole), unless this Plan expressly provides otherwise.

74.    "*Related Parties*" means the Other Entities and each of the Debtor's and such Related Party's current, former, and future entities, together with their respective current, former, and future officers, directors, members, partners, consultants, managers, employees, financial advisors, representatives, attorneys, professionals, and other agents.

75.    "*Representatives*" means, with respect to an Entity, such Entity's officers, directors, employees, members (including *ex officio* members), managers, advisors, attorneys, professionals, accountants, investment bankers, financial advisors, consultants, agents and other representatives (including its respective officers, directors, employees, members and professionals).

76.    "*Schedules*" mean the schedules of assets and liabilities, schedules of executory contracts and statements of financial affairs the Debtor Filed pursuant to section 521 of the Bankruptcy Code, including any amendments.

77.    "*Secured Claim*" means any Claim (a) to the extent reflected in the Schedules or upon a Proof of Claim as a Secured Claim, which is secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or (b) that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

78.    "*TWC Order*" means with respect to a Holder's rendition of personal services to or for the benefit of the Debtor, (i) a preliminary wage determination order issued by the Texas Workforce Commission as to which no appeal was taken in accordance with Section 61.054 of the Texas Labor Code, or (ii) an order issued by a Texas Workforce Commission wage claim tribunal in accordance with Section 61.061 of the Texas Labor Code.

79.    "*Unexpired Lease*" means a lease of non-residential real property to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

80.    "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests, a Class of Claims or Equity Interests that the Plan—

    a.   leaves unaltered the legal, equitable, and contractual rights to which such Claim or Equity Interest entitles the Holder of such Claim or Equity Interest; or

    b.   notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default—

        i.   cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in Bankruptcy Code Section 365(b)(2) or of a kind that Bankruptcy Code Section 365(b)(2) expressly does not require to be cured;

        ii.   reinstates the maturity of such Claim or Equity Interest as such maturity existed before such default;

        iii.   compensates the Holder of such Claim or Equity Interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;

        iv.   if such Claim or such Equity Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the Holder of such Claim or such Equity Interest (other than the Debtor or an Insider) for any actual pecuniary loss incurred by such Holder as a result of such failure; and

        v.   does not otherwise alter the legal, equitable, or contractual rights to which such Claim or Equity Interest entitles the Holder of such Claim or Equity Interest.

81.    "*U.S. Trustee*" means the United States Trustee appointed under Article 591 of Title 28 of the United States Code to serve in the Eastern District of Texas.

82.    "*Voting Deadline*" means, a date and time established by the Disclosure Statement Order by which Holders of certain Claims have elected to make (or have declined to make) the Class 1 Election and have voted to accept or reject this Plan.

83.    "*Wind Down*" means, as set forth in Article V.G hereof, the wind down and dissolution of the Debtor following the Effective Date.

84.    "*Wind Down, Financing and Professional Carve-Out*" means the balance of the HCA Proceeds, together with the sum of $200,000 from the the FP III Distribution, which shall be used to fund the payment of Allowed Professional Fees of the Debtor's professionals, the Financing Claim and the Wind Down Costs.

85.    "*Wind Down Costs*" means the costs incurred by the Plan Administrator following the Effective Date, including the costs to review, object to, and allow the Claims entitled to distribution under the Plan and to prosecute any Causes of Action not released under the Plan.

## ARTICLE II

## ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

A.    *Funding of the Plan*

The funding for the Plan comes from two sources: the HCA Proceeds (amounting to approximately $400,000, after the payment ad valorem tax claims) and the Consenting Secured Creditors' Carve-Out (originally amounting to approximately $2,200,000).  Distributions to certain Holders of Allowed Claims in Class 1 and Class 3 are being effectuated by the reallocation of funds that would otherwise be distributed to the Other Entities on account of their Allowed Administrative Claims.  Distributions to Holders of Allowed Professional Fee Claims and the Financing Claim and payment of all Wind Down Expenses are being funded from a partial reallocation of funds that would otherwise be distributed to the Other Entities on account of their Allowed Administrative Claims and utilization of the HCA Proceeds (following payment ad valorem tax claims).

B.    *Administrative Claims*

    1.    Allowance of Administrative Claims.

        (a)    Administrative Claims of the HTA Landlords

The Administrative Claims of the HTA Landlords have been previously allowed as an Administrative Claim pursuant to that certain Agreed Order on the Amended Motion of the HTA Landlords for Allowance and Payment of Postpetition Rent and Obligations Under Rejected Nonresidential Real Property Leases [Docket No. 210] entered by the Bankruptcy Court on August 31, 2016.

        (b)        Administrative Claims of the Other Entities

The Administrative Claims of the Other Entities have been previously Allowed as Administrative Claims pursuant to that certain Agreed Order Granting Application for Payment of Administrative Rent and for Allowance of Administrative Claim [Docket No. 303], entered by the Bankruptcy Court on December 22, 2016.

        (c)        The Financing Claim

The Financing Claim has been previously Allowed as an Administrative Claim pursuant to that certain Agreed Order Regarding Post-Petition Financing [Docket No. 144] entered by the Bankruptcy Court on June 6, 2016.

        (d)        Other Administrative Claims Arising After September 30, 2016 (Excluding Professional Fee Claims)

The Administrative Claim Bar Date Order set a bar date for the filing of certain Administrative Claims incurred prior to September 30, 2016.  Unless excluded from the scope of the Administrative Claims Bar Date Order or otherwise provided for in this Plan, all requests for allowance and payment of Administrative Claims must be Filed by the applicable Administrative Claims Bar Date and served on the Plan Administrator and the U.S. Trustee. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Allowed amounts of such Administrative Claims shall be determined by the Bankruptcy Court, unless previously Allowed by order of the Bankruptcy Court.

        (e)        Professional Compensation

All requests for allowance and payment of Professional Fee Claims, must be Filed with the Bankruptcy Court and served on the Plan Administrator and the U.S. Trustee no later than sixty (60) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court.

        2.    Payment of Administrative Claims.

        (a)        Administrative Claims of the HTA Landlords

The Administrative Claims of the HTA Landlords have been previously Allowed and paid in full pursuant to the following: (i) Order Resolving Objection of the HTA Landlords to the Debtor's Motion for Approval of Agreement Modifying or Terminating the Stay Provided for in 11 U.S.C. § 362 Pursuant to Federal Rule of Bankruptcy Procedure 4001(d) [Docket No. 252], entered by the Bankruptcy Court on October 11, 2016 and (ii) Agreed Order Granting Application for Payment of Administrative Rent and for Allowance of Administrative Claim  [Docket No. 303], entered by the Bankruptcy Court on December 22, 2016.

        (b)        All Other Administrative Claims (Excluding Professional Fee Claims,

the Financing Claim, and the HTA Landlords' Claims)

Each Holder of an Allowed Administrative Claim (other than any Professional Fee Claim, the Financing Claim, and the HTA Landlords' Claims) shall receive, in full and final satisfaction of its Administrative Claim, a Distribution equal to such Holder's Pro Rata[1] share of the Assets, not to exceed such Holder's Allowed Administrative Claim, as soon as reasonably practicable after the date on which (i) the Plan Administrator, in its sole discretion, determines that such Administrative Claim shall be Allowed or (ii) the Bankruptcy Court determines that such Administrative Claim shall be Allowed.

Notwithstanding the foregoing, the FP III Distribution shall be used by the Plan Administrator as follows:

- First, an amount not exceeding $200,000.00 shall be used solely to fund the Wind Down, Financing and Professional Carve-Out.

- Second, an amount equal to the Contributed Class 1 Amount shall be used by the Plan Administrator to fund Distributions to Holders of Class 1 Claims.

- Third, an amount equal to the Contributed Class 3 Amount shall be used by the Plan Administrator to fund Distributions to Holders of Allowed Class 3 Claims.

- Fourth, an amount equal to the Allowed Priority Tax Claims shall be used by the Plan Administrator to fund Distributions to Holders of Priority Tax Claims.

- Fifth, any remainder of the FP III Distribution (and any unused portion of the Wind Down, Financing and Professional Carve-Out) shall be paid as Distributions to FP III on account of FP III's Allowed Administrative Claim, in an amount not to exceed FP III's Allowed Administrative Claim.

(c)     Professional Compensation and the Financing Claim

Each Holder of an Allowed Professional Fee Claim and the Financing Claim shall receive Distributions solely from the HCA Proceeds and the Wind Down, Financing and Professional Carve-Out, upon entry of an Order allowing such Claim.

(d)     Post-Effective Date Professional Fees and Expenses

Except as otherwise specifically provided in this Plan, from and after the day following the Effective Date, the Plan Administrator shall, without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash from the HCA Proceeds and the Wind Down, Financing and Professional Carve-Out the reasonable legal, professional or other fees and

---

[1] For purposes of this paragraph, the term "Pro Rata" shall mean the proportion that (a) the amount that an Other Entity's Allowed Administrative Claim bears to (b) the aggregate Allowed Administrative Claims of all Other Entities.

expenses of the Plan Administrator related to the implementation and consummation of this Plan and the transactions contemplated herein. Upon the Effective Date, any requirement that professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after the Effective Date shall terminate.

### C. Priority Tax Claims

Each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of its Allowed Priority Tax Claim, its Pro Rata share of the Assets, after all Allowed Claims of Holders of Administrative Claims have been paid in full pursuant to this Plan.

## ARTICLE III

## CLASSIFICATION OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR

### A. Summary

1.	Except for the Claims addressed in Article II above (or as otherwise set forth herein), all Claims against the Debtor are placed in Classes. In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtor has not classified the Administrative Claims and Priority Tax Claims described in Article II.

2.	Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Equity Interests in the Debtor. This Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent the Claim or Equity Interest is within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest is within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

3.      Summary of Classification and
        Treatment of Classified Claims and Equity Interests[2]

| Class | Claim | Status | Voting |
|---|---|---|---|
| 1 | Claims of Employees and Similar Persons With a Current or Prior Contractual Relationship with the Debtor or the Other Entities for the Rendition of Personal Services to or for the benefit of the Debtor Who Have Made the Class 1 Election. | Impaired | Yes |
| 2 | General Unsecured Claims. | Impaired | No (deemed to reject) |
| 3 | Priority Non-Tax Claims of Employees and Similar Persons With a Current or Prior Contractual Relationship with the Debtor or the Other Entities for the Rendition of Personal Services to or for the benefit of the Debtor and Who Have Not Made the Class 1 Election | Unimpaired | No (deemed to accept) |
| 4 | Equity Interests | Impaired | No (deemed to reject) |

B.      *Classification and Treatment of Claims and Equity Interests*

   1.   Class 1—Claims of Employees and Similar Persons Claims of Employees and Similar Persons With a Current or Prior Contractual Relationship with the Debtor or the Other Entities for the Rendition of Personal Services to or for the benefit of the Debtor Who Have Made the Class 1 Election.

        (a)    *Classification*:  Class 1 consists of Claims of Employees and Similar Persons with a Current or Prior Contractual Relationship with the Debtor or the Other Entities for the Rendition of Personal Services to or for the Benefit of the Debtor Who Have Made the Class 1 Election.

        (b)    *Voting*: Class 1 is Impaired, and Holders of Class 1 Claims are entitled to vote to accept or reject this Plan.

---

[2] As noted in Article V of the Plan below, the Consenting Secured Creditors, Callidus, and the HTA Landlords have had their Claims satisfied in full during the Chapter 11 Case and are not impaired under this Plan.

(c)     *Treatment*: Each employee and similar persons with a current or prior contractual relationship with the Debtor or the Other Entities for the rendition of personal services to or for the benefit of the Debtor shall receive a Distribution as follows:

(I)     Holders of Allowed Class 1 Claims Subject To A TWC Order:

Holders of Allowed Class 1 Claims subject to a TWC Order in favor of such Holder shall receive a single Distribution totaling:

(A)     the lesser of

(i)     the amount awarded in such TWC Order in favor of such Holder minus any payments received by such Holder on account of such TWC Order; or

(ii)    $12,475.00, which is the maximum amount of a wage claim that can be accorded priority treatment under the Bankruptcy Code;

plus

(B)     $500.00.

For demonstrative purposes only, an Allowed Class 1 Claim Holder with a TWC Order in favor of such Holder in the amount of $5,000 who has previously received $1,000 under the TWC Order will receive a single Distribution of $5,000 minus $1,000 plus $500 for a total payment of $4,500.  An Allowed Class 1 Claim Holder with a TWC Order in favor of such Holder in the amount of $15,000 who has previously received $1,000 under the TWC Order will receive a single Distribution of $12,475.00 plus $500 for a total payment of $12,975.00.

(II)    Holders of Allowed Class 1 Claims Not Subject To A TWC Order:

In the absence of a TWC Order in favor of a Holder of an Allowed Class 1 Claim, such Holder of an Allowed Class 1 Claim shall receive a single Distribution totaling:

(A)     the lesser of

(i)     such Holder's Allowed unpaid wage, salary,

personal service or commission claims which arise out of such Holder's rendition of personal services to or for the benefit of the Debtor, excluding vacation, severance, sick or other employee benefits of any kind, without interest, fees or charges as reflected in the Debtor's books and record; or

(ii)   $12,475.00, which is the maximum amount of a wage claim that can be accorded priority treatment under the Bankruptcy Code;

plus

(B)   $500.00.

For demonstrative purposes only, an Allowed Class 1 Claim Holder without a TWC Order in favor of such Holder but who has unpaid wages in the amount of $1,500 will receive a single Distribution of $1,500 plus $500 for a total payment of $2,000. An Allowed Class 1 Claim Holder without a TWC Order in favor of such Holder but who has unpaid wages in the amount of $15,000 will receive a single Distribution of $12,475 plus $500 for a total payment of $12,975.

The amounts and calculations of each Holder's proposed Allowed Class 1 Claim Distribution shall be set forth by the Debtor on the Ballot of each Holder and may not be altered without the consent of the Debtor. Holders affirmatively making the Class 1 Election are electing to (A) accept the Distributions set forth on the Ballot in full and final satisfaction of such Holder's Class 1 Claim and any other Claims such Holder may have against the Debtor or the Related Parties directly or indirectly related to the Holder's rendition of personal services to or for the benefit of the Debtor; and (B) grant the Class 1 Release; and (C) waive any and all claims for compensation exceeding the amount set forth on such Holder's Ballot.

(d)   No Distribution will be made on account of any Proof of Claim filed by the Holder of an Allowed Class 1 Claim, other than the Distribution to such Holder as provided for under Article III, Section B.1.c of this Plan. Any amount set forth in a Proof of Claim filed by the Holder of an Allowed Class 1 Claim in excess of the amount such Holder's Distribution provided for in Article III, Section B.1.c of this Plan shall be disallowed without any further notice to or action, order or approval of the Bankruptcy Court.

2.  <u>Class 2—General Unsecured Claims</u>

    (a)    *Classification*:  Class 2 consists of General Unsecured Claims.

    (b)    *Voting*:  Class 2 is Impaired and Holders of Class 2 Claims are deemed to reject this Plan.

    (c)    *Treatment*: Holders of Class 2 Claims shall neither receive nor retain any property under this Plan.

3.  <u>Class 3—Priority Non-Tax Claims of Employees and Similar Persons Who Have a Current or Prior Contractual Relationship with the Debtor or the Other Entities for the Rendition of Personal Services to or for the Benefit of the Debtor, Who Have Not Made the Class 1 Election.</u>

    (a)    *Classification*:  Class 3 consists of the Priority Non-Tax Claims of employees and similar persons who have a current or prior contractual relationship with the Debtor or the Other Entities for the rendition of personal services to or for the benefit of the Debtor, and who have not made the Class 1 Election.

    (b)    *Voting*: Class 3 is Unimpaired, and Holders of Class 3 Claims are deemed to accept this Plan.

    (c)    *Treatment*: Upon Allowance, each Holder of an Allowed Class 3 Claim shall receive a Distribution equal to the amount of such Holder's Priority Non-Tax Claim to the extent Allowed as a Priority Non-Tax Claim against the Debtor under 11 U.S.C. § 507(a)(4) or (5), all without interest, fees or charges of any kind.  The Debtor intends to object to the Priority Non-Tax Claim of any Holder of a Class 3 Claim on the basis, inter alia, that (i) the Debtor was not the employer of such Holder, but such Holder was employed by one or more of the Other Entities; and (ii) that the Debtor has no obligation to pay accrued but unused vacation or sick leave.

4.  <u>Class 4—Equity Interests</u>

    (a)    *Classification*:  Class 4 consists of all Equity Interests.

    (b)    *Voting*:  Class 4 is Impaired and Holders of Class 4 Claims are deemed to reject this Plan.

    (c)    *Treatment*: Holders of Equity Interests shall neither receive nor retain any property under this Plan.

## ARTICLE IV

## ACCEPTANCE OR REJECTION OF
## THIS PLAN

The Debtor reserves the right to seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code. To the extent that any Class votes to reject this Plan, the Debtor further reserves the right to modify this Plan in accordance with Article XIII.A.

## ARTICLE V

## MEANS FOR IMPLEMENTATION
## OF THIS PLAN

A.    *Continuing Existence*

From and after the Effective Date, the Debtor shall continue in existence solely for the purposes consistent with the terms of this Plan, which include (1) effectuating the Wind Down by the Plan Administrator, (2) liquidating the Assets, enforcing and prosecuting Causes of Action, interests, rights and privileges of the Debtor and the Estate, (3) resolving Disputed Claims, (4) administering this Plan and taking such actions as are necessary to effectuate this Plan, and (5) filing appropriate tax returns. The Debtor shall also maintain those books, records and bank accounts necessary to effectuate the liquidation and Wind Down of the Estate.

B.    *Vesting of Assets in the Debtor*

Except as otherwise provided in this Plan or in any agreement, instrument or other document relating thereto, pursuant to section 1141 of the Bankruptcy Code, on or after the Effective Date, all Assets of the Estate and  the Debtor shall vest in the Debtor, free and clear of all Liens, Claims, charges or other encumbrances; Except as may be provided in this Plan or the Confirmation Order, on and after the Effective Date, the Debtor may use, acquire or dispose of Assets, and compromise or settle any Claims, without supervision or approval by the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

C.    *Plan Administrator*

1.    Appointment of the Plan Administrator

As of the Effective Date, the Plan Administrator shall be responsible for implementing the liquidation and Wind Down contemplated by this Plan, including monetizing or abandoning any Assets, resolving all Claims and distributing Cash pursuant to this Plan, pursuing, settling or abandoning all Assets vested in the Debtor's Estate. On the Effective Date, the Plan Administrator shall succeed to such powers as would have been applicable to the Debtor's officers, managers and members, and the Debtor shall be authorized to be (and, upon the

conclusion of the Wind Down, shall be) dissolved by the Plan Administrator. All Assets of the Estate on the Effective Date shall be transferred to the Debtor and managed and Distributed by the Plan Administrator pursuant to the terms of this Plan, and shall be held in the name of the Debtor free and clear of all Liens, Claims, charges or other encumbrances against the Debtor, and Equity Interests in the Debtor, except for rights to such Distributions provided to Holders of Allowed Claims as provided herein.

2.   Actions Against the Plan Administrator

The Confirmation Order shall state that, without permission of the Bankruptcy Court, no judicial, administrative, arbitral or other action or proceeding shall be commenced against the Plan Administrator in its official capacity, with respect to its status, duties, powers, acts or omissions as Plan Administrator in any forum other than the Bankruptcy Court.

3.   Term and Compensation of the Plan Administrator

The Plan Administrator shall serve for a term of 1 year, which shall be renewed for a yearly term until the Plan has been fully administered.

4.   Powers of the Plan Administrator

The Plan Administrator shall have all powers, authority and responsibilities specified in this Plan including the following:

    (a)    The Plan Administrator shall succeed to all such powers as would have been applicable to any of the Debtor's officers, managers or members with like effect as if authorized, exercised and taken by unanimous action of the Debtor's officers, managers and members;

    (b)    The Plan Administrator shall be authorized to take all steps necessary to effectuate the Wind Down and to take such other actions as the Plan Administrator determines are in the best interests of the Holders of Claims;

    (c)    The Plan Administrator, in its reasonable business judgment, in an expeditious and orderly manner, and only to the extent necessary, shall liquidate, and convert all of the Assets to Cash and make all Distributions in accordance with this Plan;

    (d)    The Plan Administrator, in its reasonable business judgment, in an expeditious and orderly manner, and only to the extent necessary, shall institute, prosecute, collect, compromise and settle any Causes of Action accordance herewith and without further approval or application to the Bankruptcy Court, except as otherwise provided

herein, including prosecuting and/or settling the Causes of Action pending in any court of appropriate jurisdiction;

(e)    The Plan Administrator, in its reasonable business judgment, in an expeditious and orderly manner, and only to the extent necessary, shall cause the Debtor to participate as a party or otherwise in any administrative, arbitrative or other non-judicial proceeding, and litigate or settle any Causes of Action on behalf of the Estate, or to pursue such Causes of Actions to settlement or judgment;

(f)    The Plan Administrator shall to the extent necessary, open and maintain bank accounts in the name of the Debtor, draw checks and drafts thereon by the sole signature of the Plan Administrator, and terminate such accounts as the Plan Administrator deems appropriate;

(g)    The Plan Administrator shall cause the Debtor to make Distributions and take other actions consistent with this Plan and the implementation hereof, including the establishment, reevaluation, adjustment and maintenance of appropriate reserves in accordance with this Plan;

(h)    The Plan Administrator shall cause the Debtor to collect and liquidate all Assets pursuant to this Plan and to administer the Wind Down and closing of this Chapter 11 Case;

(i)    The Plan Administrator shall cause the Debtor to file, prosecute or object to any Claims (Disputed or otherwise), and compromise or settle any Claims, prior to or after objection, without supervision or approval of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the U.S. Trustee guidelines and requirements, other than those restrictions expressly imposed by this Plan, or to seek Bankruptcy Court approval for any Claims settlements made after objection;

(j)    The Plan Administrator shall cause the Debtor to retain or engage professionals, employees and consultants, and to pay such professionals, employees and consultants the reasonable fees and expenses incurred by the Plan Administrator, and the professionals, employees and consultants that relate to the implementation of this Plan without application to the Bankruptcy Court;

(k)    The Plan Administrator shall cause the Debtor to invest Cash or moneys received by the Debtor or otherwise held by the Debtor in accordance with this Plan (which shall be in compliance with section 345 of the Bankruptcy Code);

APP 047

(l)     The Plan Administrator shall cause the Debtor to execute any documents or pleadings and take any other actions related to, or in connection with, the liquidation of the Assets and the exercise of the Plan Administrator's powers granted herein, including the exercise of the Debtor's rights to conduct discovery and oral examination of any party under Bankruptcy Rule 2004;

(m)     The Plan Administrator shall cause the Debtor to enter into any agreement or execute any document required by or consistent with this Plan, and perform all of the obligations thereunder;

(n)     The Plan Administrator shall cause the Debtor to abandon in any commercially reasonable manner any Assets that the Plan Administrator determines are of no benefit to the Debtor;

(o)     The Plan Administrator shall cause the Debtor to hold and preserve the Debtor's documents, as necessary, and to abandon or destroy documents upon the Plan Administrator's determination that the documents are no longer necessary or beneficial to the Debtor, which such documents shall be retained by the Debtor and the Plan Administrator during the pendency of such causes of action, or if no such causes of action are commenced, then until expiration of the applicable statute of limitations;

(p)     The Plan Administrator shall cause the Debtor to purchase and maintain all insurance policies and pay all insurance premiums and costs that the Plan Administrator deems necessary or advisable;

(q)     The Plan Administrator shall administer payouts from the Professional Fee Claim escrow upon Bankruptcy Court approval of Professional Fee Claims;

(r)     The Plan Administrator shall cause the reopening of the Chapter 11 Case and/or the institution of further bankruptcy or non-bankruptcy proceedings for the Debtor to distribute Assets received by the Debtor in excess of those needed to satisfy Allowed Claims of Holders entitled to Distributions under this Plan;

(s)     The Plan Administrator shall take all other actions not inconsistent with the provisions of this Plan; and

(t)     The Plan Administrator shall take all other actions not inconsistent with the provisions of this Plan, which the Plan Administrator deems reasonably necessary or desirable with respect to administering this Plan.

5.   Resignation or Removal of Plan Administrator

In the event of the dissolution, bankruptcy, insolvency or removal of the Plan Administrator, a successor trustee may be appointed by the Bankruptcy Court. The Plan Administrator may resign at any time upon 30 days' notice to the Bankruptcy Court and the Debtor's counsel.  Any other party in interest may move the Bankruptcy Court for the removal of the Plan Administrator for cause upon providing notice to the Debtor's counsel; provided, however, that if the Debtor or any other party in interest shall object to such removal within 21 days of such notice, such removal shall not be effective until approved by the Bankruptcy Court. No successor Plan Administrator hereunder shall in any event have any liability or responsibility for the acts or omissions of any of his, her or its predecessors. Every successor Plan Administrator appointed pursuant hereto shall execute, acknowledge and deliver to the Bankruptcy Court an instrument in writing accepting such appointment. Thereupon, such successor Plan Administrator, without any further action required, shall become fully vested with all of the rights, powers, duties and obligations of his, her or its predecessor.

6.   Retention of Professionals

(a)   As of and after the Effective Date, in accordance with the Plan Administrator Agreement, the Plan Administrator may cause the Debtor to retain professionals, including attorneys, accountants, investment or other financial advisors, auditors, disbursing agents, professionals from the Plan Administrator's own firm, if any, and other agents on behalf of the Debtor, as necessary or desirable to carry out the actions necessary to effectuate the Wind Down and close this Chapter 11 Case. More specifically, as of and after the Effective Date, the Plan Administrator may cause the Debtor to retain counsel in any matter related to the Estate, including counsel that has acted as counsel for the Debtor.

(b)   Following the Effective Date, the Plan Administrator may cause the Debtor to pay, without application to the Bankruptcy Court or any other court of competent jurisdiction, professionals retained by the Debtor as of and after the Effective Date.

7.   Liability, Indemnification

As of and after the Effective Date, neither the Debtor, its designees or professionals, any duly designated agent or Representative of the Debtor, including the Plan Administrator, nor any of its employees, including those employees of the Debtor assisting the Debtor and the Plan Administrator with the Wind Down, shall be liable for the act or omission of any other designee, agent or Representative of the Debtor, nor shall such parties be liable for any act or omission taken or omitted to be taken in such capacity other than for specific acts or omissions resulting from such parties' willful misconduct, gross negligence or fraud.

The Debtor shall indemnify and hold harmless any duly designated agent or Representative of the Debtor, including the Plan Administrator, its designees and professionals, all duly designated agents and Representatives thereof, and those employees of the Debtor

assisting the Debtor and the Plan Administrator with the Wind Down, from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including reasonable attorneys' fees, disbursements and related expenses) which such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Estate or this Plan, or the discharge of their duties under the Plan Administrator Agreement or hereunder; provided, however, that no such indemnification shall be made to such persons for actions or omissions as a result of willful misconduct, gross negligence or fraud.

D.      *Fees and Expenses of the Debtor and the Plan Administrator.*

Except as otherwise ordered by the Bankruptcy Court, after the Effective Date, any of the Debtor or the Plan Administrator's reasonable fees or expenses, as applicable (including the reasonable fees and expenses of professionals retained by the Debtor or the Plan Administrator), shall be paid without further order of the Bankruptcy Court.

E.      *Preservation of the Causes of Action*

1.      In accordance with section 1123(b) of the Bankruptcy Code, as of the Effective Date, all rights related to the Causes of Action shall vest in the Debtor, which such rights, whether arising before or after the Petition Date, except as otherwise released under the Plan. The Plan Administrator, as representative of the Debtor's Estate, shall retain and have the exclusive right to commence, pursue, enforce and settle, as appropriate, all Causes of Action (including all Avoidance Actions) that otherwise belong to a Debtor and arose before the Effective Date, including all Causes of Action of a trustee or debtor in possession under the Bankruptcy Code, other than those Causes of Action expressly released or compromised as part of or pursuant to the Plan or by other order of the Bankruptcy Court entered prior to the Effective Date and the Plan Administrator shall be authorized to exercise and perform the rights, powers and duties held by the Debtor's Estate with respect to all Causes of Action, including the authority under § 1123(b)(3) to provide for the settlement, adjustment, retention and enforcement of any such Causes of Action, without the consent or approval of any third party, and without any further order of the Bankruptcy Court, except as otherwise provided in this Section.

2.      Attached hereto as **Exhibit "1"** is a non-exhaustive list of all Causes of Action; *provided*, *however*, notwithstanding any otherwise applicable principle of law or equity, including any principles of judicial estoppel, *res judicata*, collateral estoppel, issue preclusion, or any similar doctrine, the failure to list, disclose, describe, identify, analyze or refer to any claim or Cause of Action or potential Cause of Action in the Plan, the Disclosure Statement, or any other document filed with the Bankruptcy Court shall in no manner waive, eliminate, modify, release, or alter the Plan Administrator's right to commence, prosecute, defend against, settle, and realize upon any Cause of Action, that the Debtor or the Estate has or may have as of the Effective Date. The Debtor reserves the right to amend **Exhibit "1"** to add additional identified Causes of Action at any time prior to the Effective Date. The Plan Administrator may commence, prosecute, defend against, recover on account of, and settle all Causes of Action in its sole discretion in accordance with the best interests of the Debtor and the Estate to effectuate

Distributions under the Plan.

3.      Unless a Cause of Action against a Person, Entity or a governmental entity is expressly waived, relinquished, released, compromised, or settled in the Plan or any Final Order, the Debtor expressly reserves such Causes of Action for later adjudication (including Causes of Action of which the Debtor may presently be unaware, or which may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time, or facts or circumstances which may change or be different from those which the Debtor now believes to exist) and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches shall apply to Causes of Action upon, or after, the Confirmation or consummation of the Plan based on the Disclosure Statement, the Plan, or the Confirmation Order, except where such Causes of Action have been expressly released by virtue of the Plan or other Final Order.

4.      The Plan Administrator (subject to the Plan) will make the decision of whether or not to pursue any Cause of Action, respectively, not otherwise released under the Plan or pursuant to other orders of a court of competent jurisdiction.  This decision will be based upon the Plan Administrator's review, as applicable, of the merits of each Cause of Action as well as the costs required to prosecute such claims in light of the limited resources available for the Distribution to Creditors.  The Plan Administrator (subject to the Plan) may seek to retain counsel on a contingency basis to prosecute some or all of such Causes of Action and may seek to finance any costs relating to the prosecution of such litigation, or may decide not to pursue such claims at all.

F.      *Directors, Managers and Officers*

On the Effective Date, the persons acting as directors, managers, and officers of the Debtor prior to the Effective Date shall be released from all further authority, duties, responsibilities and obligations relating to and arising from operations of the Debtor or this Chapter 11 Case; provided, however, nothing herein shall constitute a release or discharge by the Debtor of the parties listed on Exhibit 1 hereto for any Causes of Action arising from the claims and facts asserted by the federal government against such parties. Upon such release and discharge, the Plan Administrator shall be charged with the authority, duties, responsibilities and obligations relating to and arising from operations of the Debtor and this Chapter 11 Case.

G.      *Wind Down and Dissolution of the Debtor*

As soon as practicable after the Effective Date, the Plan Administrator, shall: (1) take any action reasonably necessary to effectuate the Wind Down; (2) file a certificate of dissolution for the Debtor, together with all other necessary corporate and company  documents, to effect the dissolution of the Debtor under applicable non-bankruptcy law; (3) complete and file all of the Debtor and the Debtor's final or otherwise required federal, state and local tax returns, as applicable; (4) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of this Plan; (5) comply with any regulatory requirements imposed on the Debtor under applicable law.

Filing of the Debtor's certificate of dissolution by the Plan Administrator shall be authorized and approved in all respects without further action under applicable law, regulation, order or rule, including any action by the Debtor or the Debtor's owners or any board, as applicable.

H.   *Continued Effectiveness of Bankruptcy Court-Approved Settlements Providing For Certain Dispositions of Collateral by the Consenting Creditors and Callidus.*

The Allowed Secured Claims of the Consenting Secured Creditors and Callidus have previously been paid in full (subject to the Reservation of Rights Provisions at Article X.D of the Plan) pursuant to the transactions and payments approved under the Conditional Lift Stay Orders, the Agreed Order Granting Expedited Motion for Authority to Compromise Controversy Pursuant to F.R.B.P. 9019 [Docket No. 283], entered by the Bankruptcy Court on November 17, 2016, and the Amended Motion for Authority to Compromise Controversy Pursuant to F.R.B.P. 9019 [Docket No. 305] entered by the Bankruptcy Court on January 4, 2017.  No further distributions under this Plan will be made to the Consenting Secured Creditors, Callidus, the HTA Landlords, or The Management Company at Forest Park Medical Center, LLC.  Moreover, all distributions previously made and approved by the Bankruptcy Court to such Holders are deemed indefeasibly paid under this Plan.

## ARTICLE VI

## PROVISIONS GOVERNING
## DISTRIBUTIONS

A.   *General Settlement of Claims Including Release of the Hospital Landlords.*

As discussed in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classifications, Distributions, releases and other benefits provided under this Plan (including the funding of Distributions to Holders of Allowed Class 1 and Allowed Class 3 Claims), upon the Effective Date, the provisions of this Plan shall constitute a good-faith compromise and settlement of all Claims, Equity Interests and controversies resolved pursuant to this Plan, except for the "Reserved Claims". Such compromise and settlement shall include a release of any and all Claims of the Debtor against the Hospital Landlords, as provided in Article X. Subject to Article VI, all Distributions made to Holders of Allowed Claims in any Class are intended to be, and shall be, final.

B.   *Interim Distributions on Account of Allowed Claims*

The Plan Administrator shall make, or shall in the Plan Administrator's sole discretion make adequate reserves for, the Distributions required to be made under Article III of this Plan. Reserves, if any, shall be distributed at the sole discretion of the Plan Administrator and shall not be subject to Bankruptcy Court approval.

APP 052

In accordance herewith, the Plan Administrator may (but shall not be required to) make a Distribution on the Effective Date if the Plan Administrator deems it appropriate and shall have the right to make more frequent interim Distributions to Holders of Allowed Claims if the Plan Administrator determines in his sole discretion that such additional interim Distributions are warranted and economical; provided, however, that any such interim Distribution shall only be made if in the Plan Administrator's sole discretion, the Plan Administrator retains amounts reasonably necessary to make all Distributions pursuant to Article III of this Plan, meet contingent liabilities, maintain the value of the Assets during liquidation, and satisfy other liabilities or expenses that the Debtor or the Plan Administrator incurs in accordance with this Plan.

C.      Final Distributions on Allowed Claims

Notwithstanding anything herein to the contrary, upon (1) the settlement and satisfaction, or disallowance, of all Administrative, Professional Fee and Priority Claims, (2) the completion and prosecution and/or settlement of all objections to all other Claims and the Causes of Action, (3) the liquidation of all Assets and (4) the completion of all matters necessary to effectuate the Wind Down, the Plan Administrator shall distribute, as soon thereafter as reasonably practicable, all remaining Assets and proceeds thereof pursuant to the terms of this Plan.

D.      Administrative Fund and Disputed Claims Reserve

Prior to making all Distributions required to be made on such date under this Plan, the Plan Administrator shall establish a separate Disputed Claims Reserve for Disputed Claims, which shall be administered by the Plan Administrator. The Plan Administrator shall reserve in Cash or other Assets, for Distribution on account of each Disputed Claim, the Pro Rata portion of the full asserted amount (or such lesser amount as may be estimated by the Bankruptcy Court in accordance with Article VII.A.3) of each Disputed Claim.

To the extent that the Assets placed in a Disputed Claims Reserve consist of Cash, such Cash shall be deposited in an interest-bearing account. the Debtor shall hold Assets in the Disputed Claims Reserve in trust for the benefit of the Holders of Claims ultimately determined to be Allowed. The Disputed Claims Reserve shall be closed and extinguished by the Plan Administrator when all Distributions and other dispositions of Cash or other Assets required to be made hereunder shall have been made in accordance with the terms of this Plan. Upon closure of the Disputed Claims Reserve, all Cash or other Assets held in the Disputed Claims Reserve shall revest in and become the Assets of the Debtor. All funds or other Assets that vest or revest in the Debtor pursuant to this paragraph shall be (a) used to pay the reasonable fees and expenses of the Plan Administrator as and to the extent set forth in this Plan and the Plan Administrator Agreement and in accordance with this Plan, and (b) thereafter, distributed to Holders of Allowed Claims in accordance with this Plan.

E.      Record Date for Distributions

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Record Date shall be treated as the Holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Record Date.  The Plan Administrator shall have no obligation to recognize  any transfer of any Claim occurring after the Record Date.  In making any Distribution with respect to any Claim, the Plan Administrator shall instead be entitled to recognize and deal with, for all purposes hereunder, only such Entity that is listed on the Proof of Claim Filed with respect thereto, or listed on the Schedules, as the Holder thereof as of the close of business on the Record Date, and upon such other evidence, record of transfer or assignment that are known to the Plan Administrator as of the Record Date.

F.     *Delivery of Distributions*

1.   <u>General Provisions; Undeliverable Distributions</u>

Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to the Holders of Allowed Claims shall be made by the Plan Administrator at (a) the address of each Holder as set forth in the Schedules, unless superseded by the address set forth on Proofs of Claim Filed by such Holder, or (b) the last known address of such Holder if no Proof of Claim is Filed or if the Debtor has been notified in writing of a change of address; If any Distribution is returned  as  undeliverable, the Plan Administrator may, in its discretion and as the Plan Administrator deems appropriate, take such efforts to determine the current address of the Holder of the Claim with respect to such Distribution; <u>provided</u>, <u>however</u>, that no Distribution to any Holder shall be made unless and until the Plan Administrator has determined  the then-current address of the Holder, at which time the Plan Administrator shall make such Distribution to such Holder without interest.

Amounts in respect of any undeliverable Distributions made by the Plan Administrator shall be returned to, and held in trust by, the Debtor until the Distributions are claimed or are deemed to be unclaimed property under section 347(b) of the Bankruptcy Code as set forth in Article VI.G.3 below.  The Plan Administrator shall have the discretion to determine how to make Distributions in the most efficient and cost-effective manner possible; <u>provided</u>, <u>however</u>, that the Plan Administrator's discretion may not be exercised in a manner inconsistent with any of this Plan's express requirements.

2.   <u>Minimum Distributions</u>

Notwithstanding anything herein to the contrary, if a Distribution to be made to a Holder of an Allowed Claim totals $50 or less in the aggregate, no such Distribution shall be made to that Holder unless a request therefor is made in writing to the Plan Administrator.

3.   <u>Unclaimed Property</u>

---

Except with respect to Assets held in the Disputed Claims Reserve, Distributions that are not claimed within the expiration of one year from the Distribution Date on which such Distribution was made shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and shall vest or revest in the Debtor free from any restrictions thereon. The Claims upon which such Distributions are based shall be automatically canceled and expunged. After the expiration of one year from the Distribution Date on which such Distribution was made, the Claim of any Entity to those Distributions shall be released and forever barred, notwithstanding federal or state escheat laws to the contrary. Nothing contained in this Plan shall require the Plan Administrator to attempt to locate any Holder of an Allowed Claim. All funds or other Assets that vests or revests in the Debtor pursuant to this Article shall be distributed by the Plan Administrator to the other Holders of Allowed Claims in accordance with the provisions of this Plan.

G.      *Surrender of Canceled Instruments and Securities*

On the Effective Date, or as soon as reasonably practicable thereafter, each Holder of a Certificate, to the extent that any exist, shall be deemed to have surrendered such Certificate to the Plan Administrator. Such surrendered Certificate shall be canceled with respect to the Debtor.

H.      *Manner of Cash Payments Under this Plan*

Cash payments made pursuant to this Plan shall be in United States dollars by checks drawn on a domestic bank selected by the Plan Administrator or by wire transfer from a domestic bank, at the option of the Plan Administrator.

I.      *Time Bar to Cash Payments by Check*

Checks issued by the Plan Administrator on account of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for the reissuance of any check that becomes null and void pursuant to this Article VI.J shall be made directly to the Plan Administrator by the Holder of the Allowed Claim to whom the check was originally issued. Any Claim in respect of such voided check shall be made in writing on or before the later of the first anniversary of the Initial Distribution Date or the first anniversary of the date on which the Claim at issue became an Allowed Claim. After such date, all Claims in respect of void checks shall be released and forever barred. The proceeds of such checks shall revest in and become the property of the Debtor as unclaimed property in accordance with section 347(b) of the Bankruptcy Code and be distributed in accordance with Article VI.G.3.

J.      *Compliance with Tax Requirements*

In connection with making Distributions under this Plan, to the extent applicable, the Plan Administrator shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit. All Distributions pursuant to this Plan shall be subject to such

withholding and reporting requirements. The Plan Administrator may withhold an entire Distribution due to any Holder of an Allowed Claim until such time as such Holder provides the necessary information to comply with any withholding requirements of any governmental unit. Any property so withheld will then be paid by the Plan Administrator to the appropriate authority. If the Holder of an Allowed Claim fails to provide the information necessary to comply with any withholding requirements of any governmental unit within six months from the date the Holder was first notified in writing of the need for such information, or for the Cash necessary to comply with any applicable withholding requirements, then such Holder's Distribution shall be treated as an undeliverable Distribution in accordance with Article VI.G.1.

### K.    Interest on Claims

Except as specifically provided for in this Plan, the Confirmation Order or other Final Order of the Bankruptcy Court (including the Final DIP Order), interest shall not accrue on Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.  Interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Petition Date to the date a final Distribution is made thereon if and after that Disputed Claim becomes an Allowed Claim. Except as expressly provided herein, or in a Final Order of the Bankruptcy Court or other court of competent jurisdiction, no prepetition Claim shall be Allowed to the extent that it is for postpetition interest or other similar charges.

### L.    Setoff and Recoupment

The Plan Administrator may, but shall not be required to, setoff against, or recoup from, any Claim and the Distributions to be made pursuant to this Plan in respect thereof, any claims or defenses of any nature whatsoever that any of the Debtor, the Estate, the Debtor or the Plan Administrator may have against the Holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim under this Plan shall constitute a waiver or release by the Debtor, the Estate, the Debtor or the Plan Administrator of any right of setoff or recoupment that any such Entity may have against the Holder of any Claim.

## ARTICLE VII

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

### A.    Resolution of Disputed Claims

#### 1.    Allowance of Claims

After the Effective Date, the Plan Administrator shall maintain any and all rights and defenses that the Debtor had with respect to any Claim, except with respect to any Claim deemed Allowed under this Plan or other Final Order of the Bankruptcy Court. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case (including the

Confirmation Order and Final DIP Order), no Claim shall become an Allowed Claim unless and until the Plan Administrator determines, in its sole discretion, that such Claim shall be Allowed or such Claim is Allowed pursuant to Final Order of the Bankruptcy Court. All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court under Bankruptcy Rule 9019, or otherwise, shall be binding on all parties.

2.   Objections to Claims

After the Confirmation Date but before the Effective Date, the Debtor, and after the Effective Date until the applicable Claims Objection Bar Date, the Plan Administrator shall maintain the exclusive authority to file objections to Claims and settle, compromise, withdraw or litigate to judgment such objections. From and after the Effective Date, the Plan Administrator may settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court. The Plan Administrator shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

3.   Claims Estimation

After the Confirmation Date but before the Effective Date, the Debtor, and after the Effective Date, the  Plan Administrator may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law, and (b) any contingent or unliquidated Claim pursuant to applicable law, including section 502(c) of the Bankruptcy Code, regardless of whether the Debtor or the Plan Administrator has previously objected to such Claim, or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during any litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed, contingent or unliquidated Claim, such estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor, or the Plan Administrator, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.

Notwithstanding any other provision in this Plan, a Claim that the Plan Administrator has expunged from the Claims Register, but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any permitted mechanism at the Plan Administrator's sole discretion.

4.   Expungement or Adjustment of Claims Without Objection

Any Claim that has been fully or partially paid, satisfied or superseded may be expunged or adjusted on the Claims Register by the Plan Administrator. Any Claim that has been amended may be adjusted on the Claims Register by the Plan Administrator.  The Plan Administrator is authorized to take the foregoing action in this Article VII.A.4 without requiring that a claims objection be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

     5.  <u>Deadline to File Objections to Claims</u>

Any objections to Claims shall be filed no later than the applicable Claims Objection Bar Date.

B.    *Disallowance of Claims*

All Claims of any Entity from which the Debtor or the Plan Administrator seek return of property under sections 542, 543, 550 or 553 of the Bankruptcy Code, or that the Debtor or the Plan Administrator allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, shall be disallowed if (1) the Entity, on the one hand, and the Debtor or the  Plan Administrator as applicable, on the other hand, agree, or the Bankruptcy Court has determined by Final Order, that such Entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code, and (2) such Entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

C.    *Amendments to Claims*

Except as otherwise provided herein, on or after the Effective Date, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or the Plan Administrator. To the extent such prior authorization is not received, any such new or amended Filed Claim shall be deemed disallowed and expunged without any further notice to or action, order or approval of the Bankruptcy Court.

D.    *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is filed prior to the Effective Date, no payment or Distribution provided under this Plan shall be made on account of such Claim, or portion thereof, unless and until such Disputed Claim becomes an Allowed Claim pursuant to a Final Order.

E.    *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions, if any, shall be made to the Holder of such Allowed Claim in accordance with the

provisions of this Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Plan Administrator shall provide the Distribution, if any, that would have been made to such Holder on the previous Distribution Dates had such Allowed Claim been allowed on such Distribution Dates, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.

## ARTICLE VIII

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Rejection of Executory Contracts and Unexpired Leases*

This Plan shall constitute a motion to reject all of the Executory Contracts and Unexpired Leases that remain with the Estate, if any, for which the Debtor shall have no further liability. The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a finding that such rejections are in the best interest of the Debtor, its Estate and all parties in interest in this Chapter 11 Case.

B.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Claims created by the rejection of Executory Contracts and Unexpired Leases pursuant to Article VIII.A of this Plan, or the expiration or termination of any executory contract or unexpired lease prior to the Effective Date, must be Filed with the Bankruptcy Court and served on the Debtor no later than 30 days after the Effective Date. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to Article VIII.A for which Proofs of Claim are not timely Filed will be forever barred from assertion against the Debtor, the Estate, the Debtor, their successors and assigns, and their assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Claims shall, as of the Effective Date, be subject to the releases and permanent injunction set forth in Article X. Unless otherwise ordered by the Bankruptcy Court, all  such Claims that are timely Filed as provided herein shall be treated as General Unsecured Claims under this Plan and shall be subject to all of the provisions of this Plan.

## ARTICLE IX

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

A.    *Conditions*

It shall be a condition to the Effective Date that the following conditions shall have been

satisfied or waived pursuant to the provisions of Article IX.B.

1.    All actions, documents, certificates and agreements necessary to implement this Plan, including documents contained in any supplement hereto, shall have been effected or executed and delivered, as the case may be, to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws; provided, however, that each document, instrument and agreement must be reasonably acceptable to the Debtor.  All conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements; and

2.    The Bankruptcy Court shall have entered the Confirmation Order and there shall be no stay of such order in effect.

B.    *Waiver of Conditions*

Notwithstanding the foregoing, but subject to Section 1127 of the Bankruptcy Code, the Debtor reserves the right to waive the occurrence of any condition precedent to the Effective Date or to modify any of the foregoing conditions precedent.  Any such written waiver of a condition precedent set forth in this Article may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate this Plan. Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

## ARTICLE X

## SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

A.    *Compromise and Settlement*

Notwithstanding anything herein to the contrary, the allowance, classification and treatment of all Allowed Claims and their respective Distributions and treatments hereunder takes into account and conforms to the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) and (c) of the Bankruptcy Code, or otherwise. As of the Effective Date, any and all such rights described in the preceding sentence are settled, compromised and released pursuant hereto. The Confirmation Order shall constitute the Bankruptcy Court's finding and determination that the settlements reflected in this Plan are (a) in the best interests of the Debtor, its Estate and all Holders of Claims, (b) fair, equitable and reasonable, (c) made in good-faith and (d) approved by the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019. The Confirmation Order shall approve the releases by all Entities of all such contractual, legal and equitable subordination rights or Causes of Action that are satisfied, compromised and settled pursuant hereto.

B.       *Exculpation*

*ON THE EFFECTIVE DATE, EFFECTIVE AS OF THE CONFIRMATION DATE, AND EXCEPT AS OTHERWISE PROVIDED HEREIN OR IN THE CONFIRMATION ORDER, THE DEBTOR, ITS PRESENT OR PAST, OFFICERS, DIRECTORS, AGENTS, MANAGERS, MEMBERS, FINANCIAL ADVISORS, ATTORNEYS, EMPLOYEES, AND REPRESENTATIVES SHALL BE RELEASED FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, CAUSES OF ACTION, AND LIABILITIES WHICH THE DEBTOR, THE REORGANIZED DEBTOR, OR ANY HOLDER OF A CLAIM AGAINST OR EQUITY INTEREST IN THE DEBTOR MAY BE ENTITLED TO ASSERT, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREAFTER ARISING, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE TAKING PLACE FROM THE PETITION DATE TO THE EFFECTIVE DATE; PROVIDED, HOWEVER, NOTHING HEREIN SHALL CONSTITUTE A RELEASE OR DISCHARGE BY THE DEBTOR OF THE PARTIES LISTED ON EXHIBIT 1 HERETO FOR ANY CAUSES OF ACTION ARISING FROM THE CLAIMS AND FACTS ASSERTED BY THE FEDERAL GOVERNMENT AGAINST SUCH PARTIES.*

C.       *Injunction*

*EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN THE CONFIRMATION ORDER, ALL ENTITIES SHALL BE PERMANENTLY ENJOINED FROM ASSERTING AGAINST THE DEBTOR, THE ESTATE, THE PLAN ADMINISTRATOR, THEIR REPRESENTATIVES, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY CLAIMS OR EQUITY INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE THAT RELATE, IN WHOLE OR IN PART, DIRECTLY OR INDIRECTLY, TO THE DEBTOR OR THIS CHAPTER 11 CASE. NOTWITHSTANDING THE FOREGOING, NOTHING HEREIN SHALL ENJOIN THE PROSECUTION OF CLAIMS AGAINST APPLICABLE POLICIES OF INSURANCE SO LONG AS NO RECOVERY IS SOUGHT AGAINST THE DEBTOR, THE ESTATE, THE PLAN ADMINISTRATOR, THEIR REPRESENTATIVES, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES.*

*ANY HOLDER OF A CLASS 1 CLAIM AFFIRMATIVELY MAKING THE CLASS 1 ELECTION SHALL BE PERMANENTLY ENJOINED FROM ASSERTING ANY AND ALL CLAIMS AGAINST THE DEBTOR OR THE RELATED PARTIES WHICH ARE THE SUBJECT OF THE CLASS 1 RELEASE.*

D.    *Reservation of Rights with Respect to Guarantors and Consenting Secured Creditors and Callidus.*

Notwithstanding the terms and conditions of this Plan, the Disclosure Statement, any order confirming the Plan, or any agreements reached between and among the Debtor, the Consenting Secured Creditors, and Callidus entered in these proceedings, (i) each Consenting Secured Creditor and Callidus in no way waives or releases any liability owed by a third-party guarantor of the obligations owing to the Consenting Secured Creditor and Callidus, and (ii) each of the guarantors of such obligations shall not in any way be prejudiced in these proceedings or in any court of competent jurisdiction in the event that any Consenting Secured Creditor or Callidus seeks to enforce the guaranty obligations against any guarantor, and the guarantors expressly preserve all of their rights, defenses (including, but not limited to, the commercial reasonableness of any disposition of collateral and the other agreements of the Debtor, the Consenting Secured Creditors, and Callidus whether in the Conditional Lift Stay Orders or otherwise), privileges and remedies against any parties in any proceedings (including, but not limited to, the Consenting Secured Creditors and Callidus) where any Consenting Secured Creditor or Callidus seeks to enforce the guaranty obligations against any guarantor.

E.    *Release of Hospital Landlords.*

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after and subject to the occurrence of the Effective Date, the Debtor and its Estate shall be deemed to have released the Hospital Landlords from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including but not limited to any derivative claims, that have or may have accrued at any time between the beginning of time and the Effective Date, whether or not the Debtor, its Estate, or the Reorganized Debtor is aware of any such claims, whether asserted or assertable on behalf of the Debtor, its Estate or the Reorganized Debtor, as applicable, whether known or unknown, foreseen or unforeseen, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, existing or hereinafter arising, in law, equity, or otherwise, that the Debtor, the Estate, or the Reorganized Debtor would have been legally entitled to assert in its own right, or on behalf of the Holder of any Claim or Equity Interest.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release contained herein, and further, shall constitute the Bankruptcy Court's finding that the release is: (1) in exchange for the good and valuable consideration provided by the Hospital Landlords; (2) a good faith settlement and compromise of the [c]laims released; (3) in the best interests of the Debtor and all Holders of Claims and Equity Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtor or its Estate asserting any [c]laim or Cause of Action released herein.

# ARTICLE XI

# BINDING NATURE OF PLAN

THIS PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR TO THE MAXIMUM EXTENT PERMITTED

BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER (A) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THIS PLAN, (B) HAS FILED A PROOF OF CLAIM OR EQUITY INTEREST IN THIS CHAPTER 11 CASE, OR FAILED TO VOTE TO ACCEPT OR REJECT THIS PLAN OR VOTED (OR IS DEEMED TO HAVE VOTED) TO REJECT THIS PLAN.

## ARTICLE XII

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain the maximum legally permissible jurisdiction over this Chapter 11 Case and all Entities with respect to all matters related to this Chapter 11 Case, the Debtor and this Plan, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim, the resolution of any and all objections to the allowance or priority of any Claim, and the resolution of any and all issues related to the release of Liens upon payment of a Secured Claim;

2.      for periods ending on or before the Effective Date, grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan;

3.      resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtor may be liable; and to adjudicate and, if necessary, liquidate, any Claims arising therefrom;

4.      ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

5.      decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the date hereof or that may be commenced in the future, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Plan Administrator after the Effective Date; provided, however, that the Plan Administrator reserves the right to commence actions in all appropriate forums and jurisdictions;

6.      enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with this Plan or the Disclosure Statement;

7.　　　resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

8.　　　hear and determine all Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

9.　　　issue injunctions and enforce them, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Effective Date or enforcement of this Plan, except as otherwise provided in this Plan;

10.　　　resolve any cases, controversies, suits or disputes with respect to the releases by the Debtor, the exculpation and other provisions contained in Article X, and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

11.　　　enter and implement such orders, or take such other actions as may be necessary or appropriate, if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

12.　　　resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

13.　　　enter an order concluding this Chapter 11 Case.

## ARTICLE XIII

## MISCELLANEOUS PROVISIONS

### A.　　Modification of Plan

Effective as of the date hereof and subject to the limitations and rights contained in this Plan:  (1) the  Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan before the entry of the Confirmation Order; and (2) after the entry of the Confirmation Order, the Debtor or the Plan Administrator, as applicable, may, upon order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission, or reconcile any inconsistency in, this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

### B.　　Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to herein shall be

binding on, and shall inure to the benefit of, such Entity's heir, executor, administrator, successor or assign.

### C.     Reservation of Rights by Debtor prior to Confirmation

Except as expressly set forth herein, including with respect to votes cast on Ballots, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order. Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtor or any other Entity with respect to this Plan, shall be, or shall be deemed to be, an admission or waiver of any rights of: (1) the Debtor with respect to the Holders of Claims against, or Equity Interests in, the Debtor, or other Entity; or (2) any Holder of a Claim or an Equity Interest, or other Entity, before the Effective Date.

### D.     Payment of Statutory Fees

The Plan Administrator shall pay all fees payable pursuant to section 1930(a) of the Judicial Code for each quarter (including any fraction thereof) until this Chapter 11 Case is closed.

### E.     Further Assurances

The Debtor or the Debtor, as applicable, all Holders of Claims receiving Distributions hereunder and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents, and take any other actions as may be reasonably necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.

### F.     Severability

If, before Confirmation, any term or provision hereof is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision then will be applicable as altered or interpreted. Notwithstanding any such order, alteration or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of this Plan shall remain in full force and effect. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### G.     Service of Documents

Any pleading, notice or other document required by this Plan to be served on or delivered to the Debtor shall be sent by overnight mail to each of the following individuals:

Bob Schleizer

Managing Partner
BlackBriar Advisors LLC
3131 McKinney Ave., Suite 600
Dallas, TX  75204

and

Howard Marc Spector
Spector & Johnson, PLLC
12770 Coit Road
Suite 1100
Dallas, TX 75251

H.      *Filing of Additional Documents*

On or before the Effective Date, the Debtor may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

Dated:    January 20, 2017.

Respectfully submitted,

By:      */s/ Howard Marc Spector*
         Howard Marc Spector
         TBA #00785023

SPECTOR & JOHNSON, PLLC
Banner Place, Suite 1100
12770 Coit Road
Dallas, Texas 75251
(214) 365-5377
FAX: (214) 237-3380
EMAIL: hspector@spectorjohnson.com

COUNSEL FOR DEBTOR

Exhibit 1

1.      Avoidance Claims under Chapter 5 of the Bankruptcy Code

2.      Causes of Action against Alan Andrew Beauchamp, Richard Ferdinand Toussaint, Jr., Wade Neal Barker, Wilton McPherson Burt, Andrea Kay Smith, Carli Adele Hempel, Kelly Wade Loter, Jackson Jacob, Douglas Sung Won, Michael Bassem Rimlawi, David Daesung Kim, William Daniel Nicholson IV, Shawn Mark Henry, Mrugeshkumar Kumar Shah, Gerald Peter Foox, Frank Gonzales Jr., Israel Ortiz, Iris Kathleen Forrest, Andrew Jonathan Hillman, Semyon Narosov, and Royce Vaughnbicklein

3.      Rights under any order of restitution.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |  |
|---|---|---|
| SHARDA PARKER and JOSE IBANEZ, Individually and on Behalf of All Others Similarly Situated, | § § § § § § | |
| Plaintiffs, | § | |
| v. | § | Civil Action No. 3:16-cv-02791-M |
| FPMC SERVICES, LLC, THE MANAGEMENT COMPANY AT FOREST PARK MEDICAL CENTER, NEAL RICHARDS GROUP, LLC, NEAL RICHARDS GROUP FOREST PARK DEVELOPMENT, LLC, and GLENDONTODD CAPITAL LLC, | § § § § § § § § | |
| Defendants. | § § § | |

## DECLARATION OF TODD FURNISS

I, Todd Furniss, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is within my personal knowledge and true and correct.

1.      I formerly served as a manager of FPMC Services, LLC.

2.      In this role, I gained knowledge of the employment practices of FPMC Services, LLC.

3.      Some employees of FPMC Services, LLC who were employed at Forest Park Medical Center's Dallas location, at or around 11990 N. Central Expressway, Dallas, Texas 75243, earned salaries, while other employees earned hourly wages.

4.      The various employees of FPMC Services, LLC working at Forest Park Medical Center's Dallas location earned different levels of incomes, enrolled in different benefits packages, and earned varying amounts of vacation benefits.

I declare under penalty of perjury that the foregoing is true and correct.

**DECLARATION OF TODD FURNISS**                                                      **PAGE 1**

# EXHIBIT E

Executed in Dallas, Texas, on February 20, 2017.

_____
Todd Furniss

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| SHARDA PARKER and JOSE IBANEZ, Individually and on Behalf of All Others Similarly Situated, §§§§§ <br> Plaintiffs, § <br> v. § <br> § <br> FPMC SERVICES, LLC, THE MANAGEMENT COMPANY AT FOREST PARK MEDICAL CENTER, NEAL RICHARDS GROUP, LLC, NEAL RICHARDS GROUP FOREST PARK DEVELOPMENT, LLC, and GLENDONTODD CAPITAL LLC, §§§§§§§§§§ <br> Defendants. §§ | Civil Action No. 3:16-cv-02791-M |

## DECLARATION OF JACOB B. KRING

I, Jacob B. Kring, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is within my personal knowledge and true and correct.

1.      On January 19, 2017, I sent an email to Richard Capshaw to determine the number and identity of former FPMC Services, LLC employees he represented.  A true and correct copy of that email is attached hereto as Exhibit 1.

2.      On January 24, 2017, I received an email from Paul Bossart.  The email included a list of people represented by Richard Capshaw, who purport to have a claim against FPMC Services, LLC arising from their alleged employment.  A true and correct copy of that email is attached hereto as Exhibit 2 with certain confidential information redacted.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Dallas, Texas, on February 20, 2017.

EXHIBIT F

Jacob B. Kring

**From:** Jacob Kring
**Sent:** Thursday, January 19, 2017 3:03 PM
**To:** 'Richard Capshaw'
**Cc:** Mark Fritsche
**Subject:** Lopez/Gurganus/Mayes

Richard:

Would you mind sending me the names of the clients you represent?  Bankruptcy counsel has asked me for their names to determine how they will be treated under the plan that will be filed soon.

Jacob B. Kring
**Hedrick Kring, PLLC**
1700 Pacific Avenue, Suite 4650 | Dallas, Texas 75201
214.880.9625 direct | 214.206.6182 mobile| 214.481.1844 fax
Jacob@HedrickKring.com | www.HedrickKring.com

1

# EXHIBIT 1

APP 072

**From:** Paul Bossart [mailto:Paul@capslaw.com]
**Sent:** Tuesday, January 24, 2017 11:13 AM
**To:** Jacob Kring
**Cc:** Richard Capshaw
**Subject:** Forest Park

Jacob,
Richard Capshaw asked that I forward the following information to you:

| Last Name | First Name | Lost Wages (Value based on pay rate = reasonable value) | Earned Lost Benefits | Total |
|---|---|---|---|---|
| Capshaw | Christopher | | Redacted | |
| Coulston | Mary | | | |
| Drake | Archie | | | |
| Gabrielsen | Adam | | | |
| Gheen | Kendal | | | |
| Golden | Adam | | | |
| Green | Gwendolyn | | | |
| Gurganus | Laura | | | |
| Johnson | Carrie | | | |
| Johnson | Kena | | | |
| Lopez | Erica | | | |
| Mayes | Janet | | | |
| Naguib | Therese Naim | | | |
| Nguyen | Gian | | | |
| Ryan | Watson | | | |
| Thomas | Thomson | | | |
| Webb | Ryan | | | |
| Zokai | Olivia | | | |
| | | | | |

Paul Bossart
Capshaw & Associates
3500 Maple, Suite 1100

EXHIBIT 2

Dallas, TX 75219
Ph: 214.761.6620
Fax: 214.761.6611

APP 074

FILED
2/24/2016 1:26:57 PM
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY

CAUSE NO.: **CC-16-00900-B**

| | | |
|---|---|---|
| ERICA LOPEZ | § | COUNTY COURT AT LAW |
| | § | |
| PLAINTIFF, | § | |
| vs. | § | |
| | § | |
| TODD FURNISS, GLENDONTODD | § | |
| CAPITAL, LLC, MARY HATCHER, WADE | § | |
| N. BARKER, M.D. AND FPMC SERVICES, | § | |
| LLC, ALL INDIVIDUALLY AND D/B/A AS | § | |
| (1) THE MANAGEMENT COMPANY AT | § | No.: _____ |
| FOREST PARK MEDICAL CENTER, LLC, | § | |
| (2) THE MANAGEMENT COMPANY AT | § | |
| FOREST PARK MEDICAL CENTER II, LLC, | § | |
| (3) THE MANAGEMENT COMPANY AT | § | |
| FOREST PARK MEDICAL CENTER III, | § | |
| LLC, (4) THE MANAGEMENT | § | |
| COMPANY AT FOREST PARK MEDICAL CENTER IV, | § | |
| LLC, AND (5) FPMC SERVICES. | § | |
| | § | |
| DEFENDANTS. | § | DALLAS COUNTY, TEXAS |

## ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Erica Lopez ("Plaintiff"), filing this Original Petition against Todd Furniss, glendonTodd Capital, LLC, Mary Hatcher, Wade N. Barker, M.D. and FPMC Services, LLC, all individually and d/b/a as (1) The Management Company at Forest Park Medical Center, LLC, (2) The Management Company at Forest Park Medical Center II, LLC, (3) The Management Company at Forest Park Medical Center III, LLC, (4) The Management Company at Forest Park Medical Center IV, LLC, and (5) FPMC Services (collectively referred to herein as "the Alter-Ego Defendants"), and in support thereof, states as follows:

ORIGINAL PETITION                                                    PAGE 1

# EXHIBIT G

APP 075

## I.
## EXPEDITED ACTION

1.    This case involves an amount in controversy of less than $100,000. Accordingly, the case is designated as an Expedited Action in accordance with Rule 169 Texas Rules of Civil Procedure.

## II.
## DISAVOWAL OF ANY RELIANCE ON ANY FEDERAL STATUTE OR LAW

2.    Plaintiff seeks no relief under any federal statute or law.  Plaintiff's claims herein sound in and are asserted pursuant solely to Texas state law.

## III.
## NATURE OF THE ACTION

3.    This is a civil suit for collection of unpaid wages and accrued benefits owed to Plaintiff.  The Alter-Ego Defendants severally and collectively are liable for Plaintiff's unpaid wages and accrued benefits based upon Alter-Ego Defendants' acts and omissions of negligence, fraudulent concealment and conversion.  The acts and omissions discussed further herein foreseeably caused Plaintiff to incur damages for which she has brought this action.

4.    Despite the illusion of independent business relationships and "arms-length" transactions, the evidence will show that Alter-Ego Defendants Todd Furniss, glendonTodd Capital, LLC, Mary Hatcher, Wade N. Barker, M.D. and FPMC Services, LLC:

    (a)    controlled the operation, management and direction of Forest Park Medical Center of Dallas (the "Dallas Facility");

    (b)    that they – as alter-egos – "called the shots" of the Management Company at Forest Park Medical Center, including decisions about what would get paid and not paid;

(c)    that they – as alter-egos – "called the shots" of FMPC Services, including decisions about whether or not employees would be directed to work despite the lack of funds to pay wages;

(d)    that they – as alter-egos – possessed actual knowledge that although employees including Plaintiff were continuing to be directed to work by the Alter-Ego Defendants, those employees would not be paid for their accrued wages and benefits prior to the closure of the Dallas Facility;

(e)    that they – as alter-egos – personally directed that employees including Plaintiff continue to work despite their non-disclosure to the Plaintiff and her fellow employees that the work would not be compensated and the benefits not honored;

(f)    that they – as alter-egos – personally directed that Plaintiff and her fellow employees continue to work despite their actual knowledge that the accrued wages earned by Plaintiff would not be paid;

(g)    that they did these things in a manner that they knew would result in the termination of Plaintiff's employment without payment of accrued wages;

(h)    that they did so for their own personal financial gain and benefit; and

(i)    that they did so to the foreseeable financial detriment of Plaintiff and her fellow employees.

The Alter-Ego Defendants possessed actual knowledge that the Dallas Facility was not solvent and despite that knowledge the Alter-Ego Defendants directed Plaintiff and her fellow employees to continue work. The Alter-Ego Defendants and the sham companies they controlled had no intent to compensate Plaintiff and her fellow employees for such work. The Alter-Ego Defendants failed to timely provide these facts to Plaintiff and her fellow employees despite having an obligation to do so, opting instead to conceal such financial information in an effort to protect their own personal investments. By concealing such information, the Alter-Ego Defendants:

(a)  unfairly deprived Plaintiff and her fellow employees of a fair opportunity to
     seek out alternative employment prior to mass layoff by the Alter-Ego
     Defendants; and

(b)  induced Plaintiff and her fellow employees to continue performing services to
     the financial benefit of the Alter-Ego Defendants and to Plaintiff's detriment.

## III.
## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the Parties because the lawsuit involves claims

within the jurisdictional limits of this Court.

6.     Venue is proper in Dallas County, Texas because all or a substantial part of the

events giving rise to the claim occurred in Dallas County, Texas and one or more of the Alter-

Ego Defendants reside in or maintain principal offices in Dallas County, Texas.

## IV.
## PARTIES

7.     Plaintiff Erica Lopez was employed by FPMC Services to work in the Dallas,

Texas Facility until she was terminated on or about October 31, 2015.  Plaintiff earned unpaid

but accrued compensation and other employee benefits and was damaged by Alter-Ego

Defendants' acts.

8.     Alter-Ego Defendant Todd Furniss is a natural person residing in Texas and

may be served with process at his principal place of business located at 2010 Cedar Springs

Road, Ste. 1549, Dallas, Texas 75201.

9.     Alter-Ego Defendant glendonTodd Capital, LLC is a Texas limited liability

company with its headquarters and principal place of business in Texas.  It may be served

through its registered agent for process – Jennifer Anderson – located at 2101 Cedar Springs

Road, Ste. 1540, Dallas, Texas 75201.

10.   Alter-Ego Defendant Mary Hatcher is a natural person residing in Texas and may be served with process at her principal place of business located at12222 N. Central Expressway, Ste. 440, Dallas, Texas 75243.

11.   Alter-Ego Defendant Wade N. Barker, M.D. is a natural person residing in Texas and may be served with process at his principal place of business located at 12222 North Central Expressway, Ste. 300, Dallas, Texas 75243.

12.   Alter-Ego Defendant FPMC Services, LLC is a Texas limited liability company with its headquarters and principal place of business in Texas.   It may be served through its registered agent for service of process, Mary Hatcher, at 12222 North Central Expressway, Suite 440, Dallas, Texas 75243.

13.   Plaintiff may name additional Defendants if discovery reveals other entities are liable for Plaintiff's damages.

## V.
## FACTUAL BACKGROUND

14.   This claim relates to the Forest Park Medical Center located at 11990 North Central Expressway, Dallas, Texas 75243 (the "Dallas Facility").

15.   Defendant glendonTodd Capital, LLC ("Defendant glendonTodd") is owned, operated and/or controlled by Defendant Todd Furniss ("Defendant Furniss"), Defendant Wade N. Barker, M.D. ("Defendant Barker"), and Defendant Mary Hatcher ("Defendant Hatcher") (collectively "the Alter-Ego Defendants").

16.   During all relevant time periods, the Alter-Ego Defendants owned, operated, controlled and/or held financial interests in (1) The Management Company at Forest Park Medical Center, LLC, (2) The Management Company at Forest Park Medical Center II, LLC,

(3) The Management Company at Forest Park Medical Center III, LLC, and (4) The Management Company at Forest Park Medical Center IV, LLC. (collectively referred to herein as "The Management Company at Forest Park Medical Center"). In addition, the Alter-Ego Defendants owned, operated, controlled and/or held financial interests in FPMC Services.

17.     The Management Company at Forest Park Medical Center provided hospital management services to the Dallas Facility, including but not limited to (a) the management of payroll; (b) the continued operation of the Dallas Facility; and (c) the decisions as to what bills, accounts and debts of the Hospital would be paid and the order of payment. FPMC Services administered payroll for the Facility's employees. By virtue of common officers, personnel, directors, managers, investors and operators shared between (a) the Alter-Ego Defendants and (b) The Management Company at Forest Park Medical Center/FPMC Services, the Alter-Ego Defendants assumed actual control and direction over:

    (a)     The management of payroll;

    (b)     The continued operation of the Dallas Facility;

    (c)     The decisions as to what bills, accounts and debts of the Dallas Facility would be paid and, assuming in the uncommon event that payment was going to be made, the order of payment; and

    (d)     The administration of payroll, including, the decision as to whether or not to issue payment to employees for accrued wages and benefits.

The Alter-Ego Defendants were involved in the day-to-day operations of the Defendants and the Facility. The Alter-Ego Defendants were aware at all relevant times of the financial status of the Facility and its ability to remain operational. The Alter-Ego Defendants were provided financial updates on a day-to-day basis. At all relevant times, the Alter-Ego Defendants

possessed actual knowledge of the inability of the Facility to remain operational and its insolvency. The Alter-Ego Defendants possessed actual knowledge that despite the continued labor of the employees, no wages would be paid. Despite such actual knowledge, the Alter-Ego Defendants directed Plaintiff and her fellow employees to continue working until the date of the mass layoff.

18.     Rather than to timely notify Plaintiff of the imminent closure of the Dallas Facility and in order to protect their own personal interests and further their own financial gain, the Alter-Ego Defendants – through their control and direction of The Management Company at Forest Park Medical Center and FPMC Services, continued to operate the Facility – employing Plaintiff and her co-workers – in order to increase the likelihood of the sale of the Facility and/or the acquisition of additional financing. The Alter-Ego Defendants did so in an attempt to further their own financial gain at the detriment of Plaintiff and her fellow employees. In addition, the Alter-Ego Defendants directed the Facility to pay certain suppliers in lieu of paying employees in order to maintain suppliers supplying other Facilities in which the Alter-Ego Defendants held financial interests.

19.     The Alter-Ego Defendants utilized Plaintiff and her fellow employees to continue the operation of the Facility despite actual knowledge that there was insufficient operating capital to pay for the services of Plaintiff and other similarly situated employees. Alter-Ego Defendants engaged in such conduct in order to protect their financial interests by enticing a buyer and/or additional investment capital.

20.     On or about October 31, 2015, Plaintiff and other employees employed at the Dallas Facility were notified of their immediate termination. On information and belief,

APP 081

Plaintiff alleges that approximately 176 employees were terminated at that Dallas Facility, constituting the entirety of the Dallas Facility workforce.   At time of their termination, Plaintiff and her fellow employees were advised that they would not be paid for their past wages and their benefits accrued for the three week period prior to their sudden termination.

21.   Plaintiff suffered employment losses due to the foregoing acts and omissions of the Alter-Ego Defendants.

22.   During all relevant time periods, the Alter-Ego Defendants were aware that there were insufficient assets to remain solvent and operational.   However, the Alter-Ego Defendants remained silent and instead directed the Dallas Facility to continue operating in an effort to recoup their own personal financial interests.

## VI.
## ALTER EGO/PIERCING THE CORPORATE VEIL

23.   During all relevant time periods, there was common ownership, interest, personnel, officers, managers and directors between the Alter-Ego Defendants, The Management Company at Forest Park Medical Center and FPMC Services.

24.   During all relevant time periods, Defendants Furniss, Hatcher and Barker managed, operated, owned, controlled and directed Defendant glendonTodd.   Defendants Furniss, Hatcher, Barker and glendonTodd managed, operated, owned, controlled and directed Defendant FPMC Services, LLC. with respect to administration of payroll functions. Defendants Furniss, Hatcher, Barker and FPMC Services, LLC utilized their positions of power and access to obtain on a day-to-day basis the data reflecting the true dire financial status of the Dallas Facility, the insolvency of the Dallas Facility and the inability of The Management Company at Forest Park Medical Center and FPMC Services to make payroll.

25.   The Alter-Ego Defendant during all relevant time periods maintained a financial interest in continued operation of the Dallas Facility.  For example, the financial interests held by the Alter-Ego Defendants included but were not limited to a percentage of net profits generated by payments to The Management Company at Forest Park Medical Center.  Closure of the Dallas Facility would result in the termination of such revenues.  Furthermore, a sale of the Dallas Facility to any potential buyer would inure to the financial benefit of the Alter-Ego Defendants who would recognize the payment of management fees which were in arrearage; the Alter-Ego Defendants sought to create the illusion that the Dallas Facility was functioning well to entice potential buyers at the expense of Plaintiff and her fellow employees.

26.   Defendants Furniss, Hatcher and Barker, as members, managing members, officers, directors, interest holders, owners and/or investors of Defendant glendonTodd and Defendant FPMC Services, LLC have attempted to utilize the latter entities as a subterfuge to escape liability for the unpaid wages for the unpaid services provided by Plaintiff and similarly situated hospital employees.  Furthermore, the Alter-Ego Defendants, as members, managing members, directors, officers, interest holders, owners and/or investors of The Management Company at Forest Park Medical Center and FPMC Services, have attempted to utilize the latter entities as a subterfuge to escape liability for the unpaid wages and accrued benefits for the unpaid services provided by Plaintiff and similarly situated hospital employees.

27.   All Alter-Ego Defendants used corporate Defendants and/or The Management Company at Forest Park Medical Center and FPMC Services to perpetrate an actual fraud on Plaintiff and other similarly situated hospital workers.  The Alter-Ego Defendants permitted and directed Plaintiff and other hospital employees to perform work when the Alter-Ego

Defendants knew that the Alter-Ego Defendants would not pay for those services. The Alter-Ego Defendants had actual knowledge of the decision and necessity so as to not pay earned wages for Plaintiff. The Alter-Ego Defendants were in control of alter ego entities The Management Company at Forest Park Medical Center and FPMC Services and directed continued work by Plaintiff and her fellow employees with knowledge that payment for these services would not be made. The Alter-Ego Defendants failed to timely advise Plaintiff and other similarly situated hospital employees of that fact. Furthermore, the Alter-Ego Plaintiffs knew that The Management Company at Forest Park Medical Center and FPMC Services were empty shells that lacked the ability to pay for the labor and materials supplied by Plaintiff and similarly situated hospital employees. The Alter-Ego Defendants controlled The Management Company at Forest Park Medical Center and FPMC Services and used those entities to avoid paying the employees at the Dallas Facility including Plaintiff. The Alter-Ego Defendants intentionally did not disclose facts relating to his control of the entities and the impact that control over the shell entities would have on the ability of Plaintiff to perform and be compensated for her work. The Alter-Ego Defendants failed to disclose these facts, although the Alter-Ego Defendants had a duty to do so, because of the Alter-Ego Defendants' special and superior knowledge to Plaintiff prior to and during Plaintiff's provision of labor and manpower at the Dallas Facility.

28.     The Alter-Ego Defendants fraudulently concealed the true facts individually and on behalf of The Management Company at Forest Park Medical Center and FPMC Services. These facts were concealed despite the Alter-Ego Defendants' knowledge of their materiality and their duty to disclose with the intent of inducing Plaintiff and her fellow employees to

continue working to perpetuate the façade to potential buyers and investors that the Dallas Facility was a sound investment. Consequently, the Alter-Ego Defendants committed fraudulent inducement against Plaintiff.

29. Due to this fraud, the Alter-Ego Defendants should be liable individually as the alter egos of the other Defendants and The Management Company at Forest Park Medical Center and FPMC Services. The Alter-Ego Defendants committed these acts for their direct personal benefit. Holding only The Property Management Company at Forest Park Medical Center and FPMC Services responsible would result in injustice.

## VII.
## CAUSES OF ACTION
### Negligence

30. Plaintiff incorporates by reference Paragraphs 1 through 29 above.

31. The Alter-Ego Defendants knew or reasonably should have known that (a) there were insufficient assets available to fairly compensate Plaintiff and her fellow employees for continued work by Plaintiff and her fellow employees at the Dallas Facility and that (b) the Dallas Facility's closure was imminent. In that regard, the Alter-Ego Defendants were informed on a day-by-day basis of the dire financial condition of the Dallas Facility; the Alter-Ego Defendants controlled and directed the management of the Dallas Facility and the payment of wages and benefits. The Alter-Ego Defendants had legal duties to disclose these facts to Plaintiff. The Alter-Ego Defendants owed the further duty, in their "alter-ego" capacity, to see that Plaintiff and her fellow employees were fairly paid accrued wages and benefits on a timely basis, by virtue of their control, direction and management of the Management Company at Forest Park Medical Center and FPMC Services. The Alter-Ego Defendants

ORIGINAL PETITION                                                                    PAGE 11

materially breached their duties by failing to disclose these facts to Plaintiff and her fellow employees and/or make prompt, fair and final payment.   These breaches by the Alter-Ego Defendants proximately caused injury to Plaintiff in the form of unpaid wages and unpaid accrued benefits.

### Fraud by Non-Disclosure/Concealment

32.     Plaintiff incorporates by reference Paragraphs 1 through 31 above.

33.     The Alter-Ego Defendants concealed from Plaintiff the fact that there were insufficient assets to pay Plaintiff and her fellow employees for work and benefits once the Alter-Ego Defendants became aware of that fact.  The Alter-Ego Defendants, the Management Company at Forest Park Medical Center and FPMC Services knew and were aware that there were insufficient assets to fairly and fully compensate Plaintiff and her fellow employees but instead concealed that fact in order to induce Plaintiff and her fellow employees to continue working at Defendant Facility.   They did so to perpetuate to the "outside world" of potential buyers and investors that "things were a-ok" when the truth was otherwise; thus, the Alter-Ego Defendants sacrificed the interests of Plaintiff and her fellow employees for the chance to protect their own selfish financial interests.   The Alter-Ego Defendants each had a duty to timely disclose the foregoing facts to Plaintiff and her fellow employees.  Furthermore, each of the foregoing facts was material to Plaintiff.  In addition, the Alter-Ego Defendants knew that Plaintiff was unaware of the undisclosed facts and Plaintiff did not have an equal opportunity to discover the undisclosed facts.  Moreover, each of the Alter-Ego Defendants was deliberately silent when each Alter-Ego Defendant had a duty to speak.  By failing to disclose the facts,

each of the Alter-Ego Defendants intended to induce Plaintiff to take action or refrain from acting, including the decision to continue performance of the work at the Dallas Facility.

34.    Plaintiff relied upon each of the aforementioned non-disclosures and was injured in the amount of her unpaid wages and benefits as a result of acting without the knowledge of the undisclosed facts.

## CONVERSION

35.    Plaintiff incorporates by reference paragraphs 1-34 above.

36.    Alter-Ego Defendants converted the value of the services rendered by Plaintiff for their own benefit.    Plaintiff was indeed to provide services which benefited Alter-Ego Defendants.    Specifically, the patients were charged for procedures that Plaintiff provided without paying Plaintiff for the wages and benefits owed.    Alter-Ego Defendants converted the value of Plaintiff's services for the sole benefits of Alter-Ego Defendants and to the detriment of Plaintiff.

## REQUEST FOR DISCLOSURE

37.    Pursuant to Rule 194 of the Texas Rules of Civil Procedure, Defendants are requested to disclose the information and material described in Rule 194.2 within thirty (30) days of the service of this Original Petition.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests and prays for judgment against the Alter-Ego Defendants for:

1)    compensatory damages for unpaid wages and benefits pursuant to Plaintiff's negligence and fraud by omission and conversion;

ORIGINAL PETITION                                                                                              PAGE 13

2)      damages created by the sudden lay-off as regards the opportunity to obtain work

for which Plaintiff would be compensated; and

3)      such other relief as the Court deems fair and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff hereby request trial by jury of all issues triable by jury.

DATED this 24th day of February 2016.

Respectfully submitted,

**CAPSHAW & ASSOCIATES**
3031 Allen Street
Suite 201
Dallas, Texas 75204
214.761.6610  214.761-6611 (F)

By:      _____

Richard A. Capshaw
State Bar No. 03783800
richard@capslaw.com
Christopher M. Blanton
State Bar No. 00796218
Christopher@capslaw.com

**ATTORNEYS FOR PLAINTIFF**

**ORIGINAL PETITION**                                                      **PAGE 14**

FILED
7/20/2016 9:59:04 AM
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY

Case 3:16-cv-02791-M   Document 23   Filed 02/20/17   Page 91 of 126   PageID 376

CAUSE NO.:_____ CC-16-03579-E

| | | |
|---|---|---|
| JANET MAYES, | § | COUNTY COURT AT LAW |
| | § | |
| PLAINTIFF, | § | |
| vs. | § | |
| | § | |
| TODD FURNISS, GLENDONTODD | § | |
| CAPITAL, LLC, MARY HATCHER, WADE | § | |
| N. BARKER, M.D. AND FPMC SERVICES, | § | |
| LLC, ALL INDIVIDUALLY AND D/B/A AS | § | |
| (1) THE MANAGEMENT COMPANY AT | § | No.: _____ |
| FOREST PARK MEDICAL CENTER, LLC, | § | |
| (2) THE MANAGEMENT COMPANY AT | § | |
| FOREST PARK MEDICAL CENTER II, LLC, | § | |
| (3) THE MANAGEMENT COMPANY AT | § | |
| FOREST PARK MEDICAL CENTER III, | § | |
| LLC, (4) THE MANAGEMENT COMPANY | § | |
| AT FOREST PARK MEDICAL CENTER IV, | § | |
| LLC, AND (5) FPMC SERVICES. | § | |
| | § | |
| DEFENDANTS. | § | DALLAS COUNTY, TEXAS |

## ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Janet Mayes ("Plaintiff"), filing this Original Petition against Todd Furniss, glendonTodd Capital, LLC, Mary Hatcher, Wade N. Barker, M.D. and FPMC Services, LLC, all individually and d/b/a as (1) The Management Company at Forest Park Medical Center, LLC, (2) The Management Company at Forest Park Medical Center II, LLC, (3) The Management Company at Forest Park Medical Center III, LLC, (4) The Management Company at Forest Park Medical Center IV, LLC, and (5) FPMC Services (collectively referred to herein as "the Alter-Ego Defendants"), and in support thereof, states as follows:

EXHIBIT H

## I.
## EXPEDITED ACTION

1.     This case involves an amount in controversy of less than $100,000. Accordingly, the case is designated as an Expedited Action in accordance with Rule 169 Texas Rules of Civil Procedure.

## II.
## DISAVOWAL OF ANY RELIANCE ON ANY FEDERAL STATUTE OR LAW

2.     Plaintiff seeks no relief under any federal statute or law.  Plaintiff's claims herein sound in and are asserted pursuant solely to Texas state law.

## III.
## NATURE OF THE ACTION

3.     This suit is brought under the Texas Civil Theft Act.  Defendants' acts described herein constitute civil "theft of services."  *See* TEX. CIV. PRAC. & REM. CODE §§ 134.001 *et seq.* (the "Texas Civil Theft Act"); *see* TEX. PENAL CODE §§ 31.04 *et seq.*  The Texas Civil Theft Act imposes civil liability on any person who engages in the theft of services as defined under Section 31.04 of the TEXAS PENAL CODE.

## III.
## JURISDICTION AND VENUE

4.     This Court has jurisdiction over the Parties because the lawsuit involves claims within the jurisdictional limits of this Court.

5.     Venue is proper in Dallas County, Texas because all or a substantial part of the events giving rise to the claim occurred in Dallas County, Texas and one or more of the Alter-Ego Defendants reside in or maintain principal offices in Dallas County, Texas.

## IV.
## PARTIES

6.      Plaintiff Janet Mayes was employed by FPMC Services to work in the Dallas, Texas Facility until she was terminated on or about October 31, 2015.

7.      Alter-Ego Defendant Todd Furniss is a natural person residing in Texas and may be served with process at his principal place of business located at 2010 Cedar Springs Road, Ste. 1549, Dallas, Texas 75201.

8.      Alter-Ego Defendant glendonTodd Capital, LLC is a Texas limited liability company with its headquarters and principal place of business in Texas.  It may be served through its registered agent for process – Jennifer Anderson – located at 2101 Cedar Springs Road, Ste. 1540, Dallas, Texas 75201.

9.      Alter-Ego Defendant Mary Hatcher is a natural person residing in Texas and may be served with process at her principal place of business located at12222 N. Central Expressway, Ste. 440, Dallas, Texas 75243.

10.      Alter-Ego Defendant Wade N. Barker, M.D. is a natural person residing in Texas and may be served with process at his principal place of business located at 12222 North Central Expressway, Ste. 300, Dallas, Texas 75243.

11.      Alter-Ego Defendant FPMC Services, LLC is a Texas limited liability company with its headquarters and principal place of business in Texas.   It may be served through its registered agent for service of process, Mary Hatcher, at 12222 North Central Expressway, Suite 440, Dallas, Texas 75243.

12.      Plaintiff may name additional Defendants if discovery reveals other entities are liable for Plaintiff's damages.

## V.
## FACTUAL BACKGROUND

13.     This claim relates to the Forest Park Medical Center located at 11990 North Central Expressway, Dallas, Texas 75243 (the "Dallas Facility").

14.     Defendant glendonTodd Capital, LLC ("Defendant glendonTodd") is owned, operated and/or controlled by Defendant Todd Furniss ("Defendant Furniss"), Defendant Wade N. Barker, M.D. ("Defendant Barker"), and Defendant Mary Hatcher ("Defendant Hatcher") (collectively "the Alter-Ego Defendants").

15.     During all relevant time periods, the Alter-Ego Defendants owned, operated, controlled and/or held financial interests in (1) The Management Company at Forest Park Medical Center, LLC, (2) The Management Company at Forest Park Medical Center II, LLC, (3) The Management Company at Forest Park Medical Center III, LLC, and (4) The Management Company at Forest Park Medical Center IV, LLC.   (collectively referred to herein as "The Management Company at Forest Park Medical Center").   In addition, the Alter-Ego Defendants owned, operated, controlled and/or held financial interests in FPMC Services.

16.     The Management Company at Forest Park Medical Center provided hospital management services to the Dallas Facility, including but not limited to (a) the management of payroll; (b) the continued operation of the Dallas Facility; and (c) the decisions as to what bills, accounts and debts of the Hospital would be paid and the order of payment.   FPMC Services administered payroll for the Facility's employees.   By virtue of common officers, personnel, directors, managers, investors and operators shared between (a) the Alter-Ego

Defendants and (b) The Management Company at Forest Park Medical Center/FPMC Services, the Alter-Ego Defendants assumed actual control and direction over:

(a)     The management of payroll;

(b)     The continued operation of the Dallas Facility;

(c)     The decisions as to what bills, accounts and debts of the Dallas Facility would be paid and, assuming in the uncommon event that payment was going to be made,  the order of payment; and

(d)     The administration of payroll, including, the decision as to whether or not to issue payment to employees for rendered services.

The Alter-Ego Defendants were involved in the day-to-day operations of the Defendants and the Facility.  The Alter-Ego Defendants were aware at all relevant times of the financial status of the Facility and its ability to remain operational.  The Alter-Ego Defendants were provided financial updates on a day-to-day basis.  At all relevant times, the Alter-Ego Defendants possessed actual knowledge of the inability of the Facility to remain operational and its insolvency.  The Alter-Ego Defendants possessed actual knowledge that despite the continued labor of the employees, no wages would be paid.  Despite such actual knowledge, the Alter-Ego Defendants directed Plaintiff and her fellow employees to continue working until the date of the mass layoff.

17.     Rather than to timely notify Plaintiff of the imminent closure of the Dallas Facility and in order to protect their own personal interests and further their own financial gain, the Alter-Ego Defendants – through their control and direction of The Management Company at Forest Park Medical Center and FPMC Services, continued to operate the Facility – utilizing valuable services provided by Plaintiff and her co-workers – in order to increase the likelihood of the sale of the Facility and/or the acquisition of additional financing.  The Alter-

Ego Defendants did so in an attempt to further their own financial gain at the detriment of Plaintiff and her fellow employees.  In addition, the Alter-Ego Defendants directed the Facility to pay certain suppliers in lieu of paying employees in order to maintain suppliers supplying other Facilities in which the Alter-Ego Defendants held financial interests.

18.     The Alter-Ego Defendants utilized Plaintiff and her fellow employees to continue the operation of the Facility despite actual knowledge that there was insufficient operating capital to pay for the services of Plaintiff and other similarly situated employees. Alter-Ego Defendants engaged in such conduct in order to protect their financial interests by enticing a buyer and/or additional investment capital.

19.     On or about October 31, 2015, Plaintiff and other employees employed at the Dallas Facility were notified of their immediate termination.  On information and belief, Plaintiff alleges that approximately 176 employees were terminated at that Dallas Facility, constituting the entirety of the Dallas Facility workforce.  At time of their termination, Plaintiff and her fellow employees were advised that they would not be paid for their services rendered for the three week period prior to their sudden termination.

20.     Plaintiff suffered employment losses due to the foregoing acts and omissions of the Alter-Ego Defendants.

21.     During all relevant time periods, the Alter-Ego Defendants were aware that there were insufficient assets to remain solvent and operational such that Plaintiff would be compensated for her rendered services.  However, the Alter-Ego Defendants remained silent and instead directed the Dallas Facility to continue operating in an effort to recoup their own personal financial interests.

## VI.
## ALTER EGO/PIERCING THE CORPORATE VEIL

22.   During all relevant time periods, there was common ownership, interest, personnel, officers, managers and directors between the Alter-Ego Defendants, The Management Company at Forest Park Medical Center and FPMC Services.

23.   During all relevant time periods, Defendants Furniss, Hatcher and Barker managed, operated, owned, controlled and directed Defendant glendonTodd.   Defendants Furniss, Hatcher, Barker and glendonTodd managed, operated, owned, controlled and directed Defendant FPMC Services, LLC with respect to administration of payroll functions. Defendants Furniss, Hatcher, Barker and FPMC Services, LLC utilized their positions of power and access to obtain on a day-to-day basis the data reflecting the true dire financial status of the Dallas Facility, the insolvency of the Dallas Facility and the inability of The Management Company at Forest Park Medical Center and FPMC Services to compensate Plaintiff for her services.

24.   The Alter-Ego Defendant during all relevant time periods maintained a financial interest in continued operation of the Dallas Facility.  For example, the financial interests held by the Alter-Ego Defendants included but were not limited to a percentage of net profits generated by payments to The Management Company at Forest Park Medical Center.  Closure of the Dallas Facility would result in the termination of such revenues.  Furthermore, a sale of the Dallas Facility to any potential buyer would inure to the financial benefit of the Alter-Ego Defendants who would recognize the payment of management fees which were in arrearage; the Alter-Ego Defendants sought to create the illusion that the Dallas Facility was functioning well to entice potential buyers at the expense of Plaintiff and her fellow employees.

25.     Defendants Furniss, Hatcher and Barker, as members, managing members, officers, directors, interest holders, owners and/or investors of Defendant glendonTodd and Defendant FPMC Services, LLC have attempted to utilize the latter entities as a subterfuge to escape liability for the unpaid wages for the unpaid services provided by Plaintiff and similarly situated hospital employees.  Furthermore, the Alter-Ego Defendants, as members, managing members, directors, officers, interest holders, owners and/or investors of The Management Company at Forest Park Medical Center and FPMC Services, have attempted to utilize the latter entities as a subterfuge to escape liability for unpaid services rendered by Plaintiff and similarly situated hospital employees.

26.     All Alter-Ego Defendants used corporate Defendants and/or The Management Company at Forest Park Medical Center and FPMC Services to perpetrate an actual fraud on Plaintiff and other similarly situated hospital workers.  The Alter-Ego Defendants permitted and directed Plaintiff and other hospital employees to perform services when the Alter-Ego Defendants knew that the Alter-Ego Defendants would not pay for those services.  The Alter-Ego Defendants had actual knowledge of the decision and necessity so as to not pay for rendered services to Plaintiff.  The Alter-Ego Defendants were in control of alter ego entities The Management Company at Forest Park Medical Center and FPMC Services and directed continued work by Plaintiff and her fellow employees with knowledge that payment for these services would not be made.  The Alter-Ego Defendants failed to timely advise Plaintiff and other similarly situated hospital employees of that fact.  Furthermore, the Alter-Ego Plaintiffs knew that The Management Company at Forest Park Medical Center and FPMC Services were empty shells that lacked the ability to pay for the services rendered by Plaintiff and similarly

situated hospital employees.  The Alter-Ego Defendants controlled The Management Company at Forest Park Medical Center and FPMC Services and used those entities to avoid paying the employees at the Dallas Facility including Plaintiff.  The Alter-Ego Defendants intentionally did not disclose facts relating to his control of the entities and the impact that control over the shell entities would have on the ability of Plaintiff to perform and be compensated for her services.  The Alter-Ego Defendants failed to disclose these facts, although the Alter-Ego Defendants had a duty to do so, because of the Alter-Ego Defendants' special and superior knowledge to Plaintiff prior to and during Plaintiff's provision of labor and manpower at the Dallas Facility.

27.    The Alter-Ego Defendants fraudulently concealed the true facts individually and on behalf of The Management Company at Forest Park Medical Center and FPMC Services. These facts were concealed despite the Alter-Ego Defendants' knowledge of their materiality and their duty to disclose with the intent of inducing Plaintiff and her fellow employees to continue working to perpetuate the façade to potential buyers and investors that the Dallas Facility was a sound investment.

28.    Under the Texas Civil Theft Act, the Alter-Ego Defendants should be liable individually as the alter egos of the other Defendants and The Management Company at Forest Park Medical Center and FPMC Services.  The Alter-Ego Defendants committed these acts for their direct personal benefit.  Holding only The Property Management Company at Forest Park Medical Center and FPMC Services responsible would result in injustice.

## VII.
## VIOLATION OF THE TEXAS CIVIL THEFT ACT

29.    Plaintiff incorporates by reference Paragraphs 1 through 28 above.

**ORIGINAL PETITION**                                                                    **PAGE 9**

30.     Defendants' acts described herein constitute civil "theft of services."   *See* Tex. Civ. Prac. & Rem. Code §§ 134.001 *et seq*. (the "Texas Civil Theft Act"); *see* Tex. Penal Code §§ 31.04 *et seq*.  The Texas Civil Theft Act imposes civil liability on any person who engages in the theft of services as defined under Section 31.04 of the Texas Penal Code.  Tex. Civ. Prac. & Rem. Code §§ 134.001 *et seq*.  Section 31.04 of the Texas Penal Code states in relevant part as follows:

Sec. 31.04.     THEFT OF SERVICE.

(a)     A person commits theft of service if, with intent to avoid payment for service that the actor knows is provided only for compensation:

  (1)     the actor intentionally or knowingly secures performance of the service by deception, . . . or false token; [or]

*     *     *

  (4)     the actor intentionally or knowingly secures the performance of the service by agreeing to provide compensation and, after the service is rendered, fails to make full payment after receiving notice demanding payment.

Tex. Penal Code §§ 31.04 *et seq*.  "Deception" is defined as follows:

(1) "Deception" means:

  (A)     creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true;

  (B)     failing to correct a false impression of law or fact that is likely to affect the judgment of another in the transaction, that the actor previously created or confirmed by words or conduct, and that the actor does not now believe to be true;

  (C)     preventing another from acquiring information likely to affect his judgment in the transaction;

*     *     *

ORIGINAL PETITION                                                           PAGE 10

(E)     promising performance that is likely to affect the judgment of another in the transaction and that the actor does not intend to perform or knows will not be performed, . . . [.]

*Id.* at §§ 31.01 *et seq.*  In the present case, Defendants had the intent to obtain services from Plaintiff but had no intent on compensating Plaintiff for those services.  Defendants understood at all times that Plaintiff intended to be compensated for her services.  Defendants knew they were not going to compensate Plaintiff for her services.  However, Defendants intentionally and knowingly secured performance of Plaintiff's services by deception and false token.  Defendants intentionally and knowingly secured Plaintiff's performance of her services by agreeing to provide compensation but after Plaintiff rendered those services, Defendants refused to pay to Plaintiff the value of those services.  Defendants secured Plaintiff's performance of services by deception, causing Plaintiff to incur damages in an amount within the jurisdiction of this Court.

## VIII.
## ATTORNEY'S FEES

31.     Plaintiff incorporates by reference Paragraph Nos. 1 through 30 above.

32.     Plaintiff seeks to recover her reasonable attorney's fees in accordance with TEX. CIV. PRAC. & REM. CODE §§ 134.005.

## REQUEST FOR DISCLOSURE

33.     Pursuant to Rule 194 of the Texas Rules of Civil Procedure, Defendants are requested to disclose the information and material described in Rule 194.2 within thirty (30) days of the service of this Original Petition.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests and prays for judgment against the Alter-Ego Defendants for:

1)     compensatory damages for her unpaid rendered services;

**ORIGINAL PETITION**                                                                 **PAGE 11**

2)      Statutory damages under TEX. CIV. PRAC. & REM. CODE §§ 134.005(a)(1);

3)      Court costs and reasonable and necessary attorney's fees; and

4)      such other relief as the Court deems fair and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff hereby request trial by jury of all issues triable by jury.


DATED this 14th day of July 2016.

                                    Respectfully submitted,

                                    **CAPSHAW & ASSOCIATES**
                                    3500 Maple Avenue
                                    Suite 1100
                                    Dallas, Texas 75219
                                    214.761.6610  214.761-6611 (F)



By:     _____
                                    Richard A. Capshaw
                                    State Bar No. 03783800
                                    richard@capslaw.com
                                    Christopher M. Blanton
                                    State Bar No. 00796218
                                    Christopher@capslaw.com

                                    **ATTORNEYS FOR PLAINTIFF**

**ORIGINAL PETITION**                                **PAGE 12**

FILED
11/13/2015 12:09:39 PM
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY

Case 3:16-cv-02791-M   Document 23   Filed 02/20/17   Page 103 of 126   PageID 388

CAUSE NO. **CC-15-05764-C**

| | | |
|---|---|---|
| LAURA GURGANUS | § | COUNTY COURT AT LAW |
| | § | |
| PLAINTIFF, | § | |
| vs. | § | |
| | § | |
| TODD FURNISS, GLENDONTODD CAPITAL, LLC, MARY HATCHER, WADE N. BARKER, M.D. AND FPMC SERVICES, LLC, ALL INDIVIDUALLY AND D/B/A AS (1) THE MANAGEMENT COMPANY AT FOREST PARK MEDICAL CENTER, LLC, (2) THE MANAGEMENT COMPANY AT FOREST PARK MEDICAL CENTER II, LLC, (3) THE MANAGEMENT COMPANY AT FOREST PARK MEDICAL CENTER III, LLC, (4) THE MANAGEMENT COMPANY AT FOREST PARK MEDICAL CENTER IV, LLC, AND (5) FPMC SERVICES. | § § § § § § § § § § § § § § | No.: _____ |
| | § | |
| DEFENDANTS. | § | DALLAS COUNTY, TEXAS |

## ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Laura Gurganus ("Plaintiff"), filing this her Original Petition against Todd Furniss, glendonTodd Capital, LLC, Mary Hatcher, Wade N. Barker, M.D. and FPMC Services, LLC, all individually and d/b/a as (1) The Management Company at Forest Park Medical Center, LLC, (2) The Management Company at Forest Park Medical Center II, LLC, (3) The Management Company at Forest Park Medical Center III, LLC, (4) The Management Company at Forest Park Medical Center IV, LLC, and (5) FPMC Services (collectively referred to herein as "the Alter-Ego Defendants"), and in support thereof, states as follows:

ORIGINAL PETITION                                                                                          PAGE 1

# EXHIBIT I

APP 101

**I.**

**EXPEDITED ACTION**

1.     This case involves an amount in controversy of less than $100,000. Accordingly, the case is designated as an Expedited Action in accordance with Rule 169 Texas Rules of Civil Procedure.

**II.**

**NATURE OF THE ACTION**

2.     This is a civil suit for collection of unpaid wages and accrued benefits owed to Plaintiff.  The Alter-Ego Defendants severally and collectively are liable for Plaintiff's unpaid wages and accrued benefits based upon Alter-Ego Defendants' acts and omissions of negligence, fraudulent concealment and conversion.  The acts and omissions discussed further herein foreseeably caused Plaintiff to incur damages for which she has brought this action.

3.     Despite the illusion of independent business relationships and "arms-length" transactions, the evidence will show that Alter-Ego Defendants Todd Furniss, glendonTodd Capital, LLC, Mary Hatcher, Wade N. Barker, M.D. and FPMC Services, LLC:

(a)     controlled the operation, management and direction of Forest Park Medical Center of Dallas (the "Dallas Facility");

(b)     that they – as alter-egos – "called the shots" of the Management Company at Forest Park Medical Center, including decisions about what would get paid and not paid;

(c)     that they – as alter-egos – "called the shots" of FMPC Services, including decisions about whether or not employees would be directed to work despite the lack of funds to pay wages;

(d)     that they – as alter-egos – possessed actual knowledge that although employees including Plaintiff were continuing to be directed to work by the Alter-Ego Defendants, those employees would not be paid for their accrued wages and benefits prior to the closure of the Dallas Facility;

(e)     that they – as alter-egos – personally directed that employees including Plaintiff continue to work despite their non-disclosure to the Plaintiff and her fellow employees that the work would not be compensated and the benefits not honored;

(f)     that they – as alter-egos – personally directed that Plaintiff and her fellow employees continue to work despite their actual knowledge that the accrued wages earned by Plaintiff would not be paid;

(g)     that they did these things in a manner that they knew would result in the termination of Plaintiff's employment without payment of accrued wages;

(h)     that they did so for their own personal financial gain and benefit; and

(i)     that they did so to the foreseeable financial detriment of Plaintiff and her fellow employees.

The Alter-Ego Defendants possessed actual knowledge that the Dallas Facility was not solvent and despite that knowledge the Alter-Ego Defendants directed Plaintiff and her fellow employees to continue work.   The Alter-Ego Defendants and the sham companies they controlled had no intent to compensate Plaintiff and her fellow employees for such work.   The Alter-Ego Defendants failed to timely provide these facts to Plaintiff and her fellow employees despite having an obligation to do so, opting instead to conceal such financial information in an effort to protect their own personal investments.   By concealing such information, the Alter-Ego Defendants:

(a)     unfairly deprived Plaintiff and her fellow employees of a fair opportunity to seek out alternative employment prior to mass layoff by the Alter-Ego Defendants; and

(b)     induced Plaintiff and her fellow employees to continue performing services to the financial benefit of the Alter-Ego Defendants and to Plaintiff's detriment.

**ORIGINAL PETITION**                                                                                    **PAGE 3**

**III.**
**JURISDICTION AND VENUE**

4.     This Court has jurisdiction over the Parties because the lawsuit involves claims within the jurisdictional limits of this Court.

5.      Venue is proper in Dallas County, Texas because all or a substantial part of the events giving rise to the claim occurred in Dallas County, Texas and one or more of the Alter-Ego Defendants reside in or maintain principal offices in Dallas County, Texas.

**IV.**
**PARTIES**

6.     Plaintiff Laura Gurganus was employed by FPMC Services to work in the Dallas, Texas Facility as a scrub nurse until she was terminated on or about October 31, 2015. Plaintiff earned unpaid but accrued compensation and other employee benefits and was damaged by Alter-Ego Defendants' acts.

7.     Alter-Ego Defendant Todd Furniss is a natural person residing in Texas and may be served with process at his principal place of business located at 2010 Cedar Springs Road, Ste. 1549, Dallas, Texas 75201.

8.     Alter-Ego Defendant glendonTodd Capital, LLC is a Texas limited liability company with its headquarters and principal place of business in Texas.  It may be served through its registered agent for process – Jennifer Anderson – located at 2101 Cedar Springs Road, Ste. 1540, Dallas, Texas 75201.

9.     Alter-Ego Defendant Mary Hatcher is a natural person residing in Texas and may be served with process at her principal place of business located at12222 N. Central Expressway, Ste. 440, Dallas, Texas 75243.

10.     Alter-Ego Defendant Wade N. Barker, M.D. is a natural person residing in Texas and may be served with process at his principal place of business located at 12222 North Central Expressway, Ste. 300, Dallas, Texas 75243.

11.     Alter-Ego Defendant FPMC Services, LLC is a Texas limited liability company with its headquarters and principal place of business in Texas.   It may be served through its registered agent for service of process, Mary Hatcher, at 12222 North Central Expressway, Suite 440, Dallas, Texas 75243.

12.     Plaintiff may name additional Defendants if discovery reveals other entities are liable for Plaintiff's damages.

### V.
### FACTUAL BACKGROUND

13.     This claim relates to the Forest Park Medical Center located at 11990 North Central Expressway, Dallas, Texas 75243 (the "Dallas Facility").

14.     Defendant glendonTodd Capital, LLC ("Defendant glendonTodd") is owned, operated and/or controlled by Defendant Todd Furniss ("Defendant Furniss"), Defendant Wade N. Barker, M.D. ("Defendant Barker"), and Defendant Mary Hatcher ("Defendant Hatcher") (collectively "the Alter-Ego Defendants").

15.     During all relevant time periods, the Alter-Ego Defendants owned, operated, controlled and/or held financial interests in (1) The Management Company at Forest Park Medical Center, LLC, (2) The Management Company at Forest Park Medical Center II, LLC, (3) The Management Company at Forest Park Medical Center III, LLC, and (4) The Management Company at Forest Park Medical Center IV, LLC.   (collectively referred to herein as "The Management Company at Forest Park Medical Center").   In addition, the

Alter-Ego Defendants owned, operated, controlled and/or held financial interests in FPMC Services.

16.     The Management Company at Forest Park Medical Center provided hospital management services to the Dallas Facility, including but not limited to (a) the management of payroll; (b) the continued operation of the Dallas Facility; and (c) the decisions as to what bills, accounts and debts of the Hospital would be paid and the order of payment.   FPMC Services administered payroll for the Facility's employees.   By virtue of common officers, personnel, directors, managers, investors and operators shared between (a) the Alter-Ego Defendants and (b) The Management Company at Forest Park Medical Center/FPMC Services, the Alter-Ego Defendants assumed actual control and direction over:

(a)     The management of payroll;

(b)     The continued operation of the Dallas Facility;

(c)     The decisions as to what bills, accounts and debts of the Dallas Facility would be paid and, assuming in the uncommon event that payment was going to be made,  the order of payment; and

(d)     The administration of payroll, including, the decision as to whether or not to issue payment to employees for accrued wages and benefits.

The Alter-Ego Defendants were involved in the day-to-day operations of the Defendants and the Facility.   The Alter-Ego Defendants were aware at all relevant times of the financial status of the Facility and its ability to remain operational.   The Alter-Ego Defendants were provided financial updates on a day-to-day basis.   At all relevant times, the Alter-Ego Defendants possessed actual knowledge of the inability of the Facility to remain operational and its insolvency.   The Alter-Ego Defendants possessed actual knowledge that despite the continued labor of the employees, no wages would be paid.   Despite such actual knowledge, the Alter-

Ego Defendants directed Plaintiff and her fellow employees to continue working until the date of the mass layoff.

17.     Rather than to timely notify Plaintiff of the imminent closure of the Dallas Facility and in order to protect their own personal interests and further their own financial gain, the Alter-Ego Defendants – through their control and direction of The Management Company at Forest Park Medical Center and FPMC Services, continued to operate the Facility – employing Plaintiff and her co-workers – in order to increase the likelihood of the sale of the Facility and/or the acquisition of additional financing.  The Alter-Ego Defendants did so in an attempt to further their own financial gain at the detriment of Plaintiff and her fellow employees.  In addition, the Alter-Ego Defendants directed the Facility to pay certain suppliers in lieu of paying employees in order to maintain suppliers supplying other Facilities in which the Alter-Ego Defendants held financial interests.

18.     The Alter-Ego Defendants utilized Plaintiff and her fellow employees to continue the operation of the Facility despite actual knowledge that there was insufficient operating capital to pay for the services of Plaintiff and other similarly situated employees. Alter-Ego Defendants engaged in such conduct in order to protect their financial interests by enticing a buyer and/or additional investment capital.

19.     On or about October 31, 2015, Plaintiff and other employees employed at the Dallas Facility were notified of their immediate termination.  On information and belief, Plaintiff alleges that approximately 176 employees were terminated at that Dallas Facility, constituting the entirety of the Dallas Facility workforce.  At time of their termination,

Plaintiff and her fellow employees were advised that they would not be paid for their past wages and their benefits accrued for the three week period prior to their sudden termination.

20.     Plaintiff suffered employment losses due to the foregoing acts and omissions of the Alter-Ego Defendants.

21.     During all relevant time periods, the Alter-Ego Defendants were aware that there were insufficient assets to remain solvent and operational.   However, the Alter-Ego Defendants remained silent and instead directed the Dallas Facility to continue operating in an effort to recoup their own personal financial interests.

## VI.
## ALTER EGO/PIERCING THE CORPORATE VEIL

22.     During all relevant time periods, there was common ownership, interest, personnel, officers, managers and directors between the Alter-Ego Defendants, The Management Company at Forest Park Medical Center and FPMC Services.

23.     During all relevant time periods, Defendants Furniss, Hatcher and Barker managed, operated, owned, controlled and directed Defendant glendonTodd.    Defendants Furniss, Hatcher, Barker and glendonTodd managed, operated, owned, controlled and directed Defendant FPMC Services, LLC. with respect to administration of payroll functions. Defendants Furniss, Hatcher, Barker and FPMC Services, LLC utilized their positions of power and access to obtain on a day-to-day basis the data reflecting the true dire financial status of the Dallas Facility, the insolvency of the Dallas Facility and the inability of The Management Company at Forest Park Medical Center and FPMC Services to make payroll.

24.     The Alter-Ego Defendant during all relevant time periods maintained a financial interest in continued operation of the Dallas Facility.   For example, the financial interests held

by the Alter-Ego Defendants included but were not limited to a percentage of net profits generated by payments to The Management Company at Forest Park Medical Center.  Closure of the Dallas Facility would result in the termination of such revenues.  Furthermore, a sale of the Dallas Facility to any potential buyer would inure to the financial benefit of the Alter-Ego Defendants who would recognize the payment of management fees which were in arrearage; the Alter-Ego Defendants sought to create the illusion that the Dallas Facility was functioning well to entice potential buyers at the expense of Plaintiff and her fellow employees.

25.     Defendants Furniss, Hatcher and Barker, as members, managing members, officers, directors, interest holders, owners and/or investors of Defendant glendonTodd and Defendant FPMC Services, LLC have attempted to utilize the latter entities as a subterfuge to escape liability for the unpaid wages for the unpaid services provided by Plaintiff and similarly situated hospital employees.  Furthermore, the Alter-Ego Defendants, as members, managing members, directors, officers, interest holders, owners and/or investors of The Management Company at Forest Park Medical Center and FPMC Services, have attempted to utilize the latter entities as a subterfuge to escape liability for the unpaid wages and accrued benefits for the unpaid services provided by Plaintiff and similarly situated hospital employees.

26.     All Alter-Ego Defendants used corporate Defendants and/or The Management Company at Forest Park Medical Center and FPMC Services to perpetrate an actual fraud on Plaintiff and other similarly situated hospital workers.  The Alter-Ego Defendants permitted and directed Plaintiff and other hospital employees to perform work when the Alter-Ego Defendants knew that the Alter-Ego Defendants would not pay for those services.  The Alter-Ego Defendants had actual knowledge of the decision and necessity so as to not pay earned

wages for Plaintiff.   The Alter-Ego Defendants were in control of alter ego entities The Management Company at Forest Park Medical Center and FPMC Services and directed continued work by Plaintiff and her fellow employees with knowledge that payment for these services would not be made.   The Alter-Ego Defendants failed to timely advise Plaintiff and other similarly situated hospital employees of that fact.   Furthermore, the Alter-Ego Plaintiffs knew that The Management Company at Forest Park Medical Center and FPMC Services were empty shells that lacked the ability to pay for the labor and materials supplied by Plaintiff and similarly situated hospital employees.   The Alter-Ego Defendants controlled The Management Company at Forest Park Medical Center and FPMC Services and used those entities to avoid paying the employees at the Dallas Facility including Plaintiff.   The Alter-Ego Defendants intentionally did not disclose facts relating to his control of the entities and the impact that control over the shell entities would have on the ability of Plaintiff to perform and be compensated for her work.   The Alter-Ego Defendants failed to disclose these facts, although the Alter-Ego Defendants had a duty to do so, because of the Alter-Ego Defendants' special and superior knowledge to Plaintiff prior to and during Plaintiff's provision of labor and manpower at the Dallas Facility.

27.     The Alter-Ego Defendants fraudulently concealed the true facts individually and on behalf of The Management Company at Forest Park Medical Center and FPMC Services. These facts were concealed despite the Alter-Ego Defendants' knowledge of their materiality and their duty to disclose with the intent of inducing Plaintiff and her fellow employees to continue working to perpetuate the façade to potential buyers and investors that the Dallas

Facility was a sound investment.   Consequently, the Alter-Ego Defendants committed fraudulent inducement against Plaintiff.

28.      Due to this fraud, the Alter-Ego Defendants should be liable individually as the alter egos of the other Defendants and The Management Company at Forest Park Medical Center and FPMC Services.   The Alter-Ego Defendants committed these acts for their direct personal benefit.   Holding only The Property Management Company at Forest Park Medical Center and FPMC Services responsible would result in injustice.

**VII.**

**CAUSES OF ACTION**

**Negligence**

29.      Plaintiff incorporates by reference Paragraphs 1 through 28 above.

30.      The Alter-Ego Defendants knew or reasonably should have known that (a) there were insufficient assets available to fairly compensate Plaintiff and her fellow employees for continued work by Plaintiff and her fellow employees at the Dallas Facility and that (b) the Dallas Facility's closure was imminent.   In that regard, the Alter-Ego Defendants were informed on a day-by-day basis of the dire financial condition of the Dallas Facility; the Alter-Ego Defendants controlled and directed the management of the Dallas Facility and the payment of wages and benefits.   The Alter-Ego Defendants had legal duties, including duties under the WARN Act and the FLSA, to disclose these facts to Plaintiff.   The Alter-Ego Defendants owed the further duty, in their "alter-ego" capacity, to see that Plaintiff and her fellow employees were fairly paid accrued wages and benefits on a timely basis, by virtue of their control, direction and management of the Management Company at Forest Park Medical Center and FPMC Services.   The Alter-Ego Defendants materially breached their duties by failing to

disclose these facts to Plaintiff and her fellow employees and/or make prompt, fair and final payment. These breaches by the Alter-Ego Defendants proximately caused injury to Plaintiff in the form of unpaid wages and unpaid accrued benefits.

**Fraud by Non-Disclosure/Concealment**

31.     Plaintiff incorporates by reference Paragraphs 1 through 30 above.

32.     The Alter-Ego Defendants concealed from Plaintiff the fact that there were insufficient assets to pay Plaintiff and her fellow employees for work and benefits once the Alter-Ego Defendants became aware of that fact. The Alter-Ego Defendants, the Management Company at Forest Park Medical Center and FPMC Services knew and were aware that there were insufficient assets to fairly and fully compensate Plaintiff and her fellow employees but instead concealed that fact in order to induce Plaintiff and her fellow employees to continue working at Defendant Facility. They did so to perpetuate to the "outside world" of potential buyers and investors that "things were a-ok" when the truth was otherwise; thus, the Alter-Ego Defendants sacrificed the interests of Plaintiff and her fellow employees for the chance to protect their own selfish financial interests. The Alter-Ego Defendants each had a duty to timely disclose the foregoing facts to Plaintiff and her fellow employees. Furthermore, each of the foregoing facts was material to Plaintiff. In addition, the Alter-Ego Defendants knew that Plaintiff was unaware of the undisclosed facts and Plaintiff did not have an equal opportunity to discover the undisclosed facts. Moreover, each of the Alter-Ego Defendants was deliberately silent when each Alter-Ego Defendant had a duty to speak. By failing to disclose the facts, each of the Alter-Ego Defendants intended to induce Plaintiff to take action or refrain from acting, including the decision to continue performance of the work at the Dallas Facility.

33.     Plaintiff relied upon each of the aforementioned non-disclosures and was injured in the amount of her unpaid wages and benefits as a result of acting without the knowledge of the undisclosed facts.

## CONVERSION

34.     Plaintiff incorporates by reference paragraphs 1-33 above.

35.     Alter-Ego Defendants converted the value of the services rendered by Plaintiff for their own benefit.   Plaintiff was indeed to provide services which benefited Alter-Ego Defendants.   Specifically, the patients were charged for procedures that Plaintiff provided without paying Plaintiff for the wages and benefits owed.   Alter-Ego Defendants converted the value of Plaintiff's services for the sole benefits of Alter-Ego Defendants and to the detriment of Plaintiff.

## REQUEST FOR DISCLOSURE

36.     Pursuant to Rule 194 of the Texas Rules of Civil Procedure, Defendants are requested to disclose the information and material described in Rule 194.2 within thirty (30) days of the service of this Original Petition.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests and prays for judgment against the Alter-Ego Defendants for:

1)     compensatory damages for unpaid wages and benefits pursuant to Plaintiff's negligence and fraud by omission and conversion;

2)     damages created by the sudden lay-off as regards the opportunity to obtain work for which Plaintiff would be compensated; and

3)      such other relief as the Court deems fair and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff hereby request trial by jury of all issues triable by jury.

DATED this 13th day of November 2015.

Respectfully submitted,

**CAPSHAW & ASSOCIATES**
3031 Allen Street
Suite 201
Dallas, Texas 75204
214.761.6610  214.761-6611 (F)

By:    _____
Richard A. Capshaw
State Bar No. 03783800
richard@capslaw.com
Christopher M. Blanton
State Bar No. 00796218
Christopher@capslaw.com

**ATTORNEYS FOR PLAINTIFF**

**ORIGINAL PETITION**                                                                    **PAGE 14**

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| LAURA GURGANUS, ON BEHALF OF | § | |
| HERSELF AND ALL OTHERS | § | |
| SIMILARLY SITUATED, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | Civil Action No. 3:15-CV-03964-M |
| v. | § | |
| | § | |
| TODD FURNISS, et al., | § | |
| | § | |
| Defendants. | § | |

<u>**ORDER OF DISMISSAL AND REMAND**</u>

Before the Court is Plaintiff's Waiver of WARN Act Claim in Response to the Court's Memorandum Opinion and Order and Request for Remand [Docket Entry #18].  For the reasons stated below, in addition to those previously stated in the Court's July 13, 2016, Memorandum Opinion and Order [*see* Docket Entry #17], Plaintiff's WARN Act claim is **DISMISSED WITH PREJUDICE**, and the remaining state law claims are **REMANDED** to County Court at Law No. 3 in Dallas, Texas.

**I.      BACKGROUND**

This case arises out of the closure of Forest Park Medical Center, located in Dallas, Texas (the "Dallas Facility").  On November 13, 2015, Plaintiff Laura Gurganus filed this lawsuit in County Court at Law No. 3 in Dallas, Texas, asserting state law causes of action against her former employer and others for negligence, fraud, and conversion in connection with the Dallas Facility's closure.  Defendants removed this action based on federal question jurisdiction, asserting that the state law claims implicated federal statutes.  On January 12, 2016, Plaintiff filed an amended

1

**EXHIBIT J**

complaint, on behalf of herself and a putative class, adding a claim for violations of the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq.* (the "WARN Act") (Count One), and re-alleging her state law claims of negligence (Count Two), and fraud by non-disclosure (Count Three).  Defendants moved to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6).  On July 13, 2016, the Court granted Defendants' motion to dismiss Plaintiff's WARN Act claim, allowed Plaintiff until August 12, 2016, to replead, and deferred consideration of whether to exercise supplemental jurisdiction over the state law claims until after Plaintiff filed an amended complaint.  *See* Mem. Op. and Ord. 12 [Docket Entry #17].  In addition, recognizing that Plaintiff had requested remand as an alternative to repleading in her response to the motion to dismiss, the Court ordered that it would remand the remaining state law claims if Plaintiff opted not to replead her WARN Act claim.  *Id.*  On July 26, 2016, Plaintiff notified the Court that, rather than amending, she was opting instead to waive her WARN Act claim.  *See* Pl.'s Waiver of WARN Act Claim in Resp. to the Court's Mem. Op. and Ord. [Docket Entry #18].  On August 1, 2016, Defendants filed a response thereto, contending that Plaintiff's waiver of her WARN Act claim was "a blatant attempt at forum shopping," and urging the Court to exercise jurisdiction over the remaining state law claims, rather than remand.  Defs.' Resp. 11 [Docket Entry #20].[1]  Although the Court granted Plaintiff leave to respond to Defendants' filing, Plaintiff opted not to file a  response.

## II. ANALYSIS

In their Notice of Removal, Defendants asserted that Plaintiff's state law claims implicated federal statutes, and therefore gave rise to federal question jurisdiction.  Specifically, Defendants stated:

---

[1] On July 26, 2016, counsel for Defendants contacted the Court's law clerk and requested leave to respond to Plaintiff's filing, which the Court allowed.  *See* Order [Docket Entry #19].

This Court has federal-question jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1441 because Plaintiff's Petition provides Defendants notice of purported violations of the [WARN Act] and the Fair Labor Standards Act ("FLSA"), which are both federal statutes. Because Plaintiff's Petition alleges violations of federal statutes that form the basis of Plaintiff's claims and the underlying facts, this Court has federal question jurisdiction.

Defs.' Notice of Removal 2 [Docket Entry #1].  In their current Response to Plaintiff's waiver of her WARN Act claim, Defendants reurge these arguments, contending that this Court should retain jurisdiction over the remaining state law claims because they necessarily implicate the WARN Act and the FLSA.  Alternatively, Defendants argue that the Court should retain supplemental jurisdiction over the remaining state law claims under the statutory factors set forth in 28 U.S.C. § 1367(c), and the common law factors outlined in *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 (1998).  The Court considers these arguments in turn.

### A.     Substantial Federal Question Doctrine

Section 1441(a) of Title 28 authorizes a defendant to remove to federal court any civil action brought in state court over which the district court has original jurisdiction.  28 U.S.C. § 1441(a).  The removal statute should be strictly construed in favor of remand, and Defendants bear the burden of demonstrating that federal jurisdiction exists.  *See De Aguilar v. Boeing Co.,* 47 F.3d 1404, 1408 (5th Cir. 1995); *Manguro v. Prudential Prop. & Cas. Ins. Co.,* 276 F.3d 720, 723 (5th Cir. 2002).  It is undisputed that the parties are not completely diverse citizens and that Plaintiff does not assert a cause of action created by federal law, but rather asserts causes of action for negligence and fraud.  This case was therefore removable in the first instance only if Plaintiff's state law claims arise under federal law pursuant to 28 U.S.C. § 1331, which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

3

A federal court has federal question jurisdiction over an action only if "a federal question appears on the face of the plaintiff's well-pleaded complaint." *Elam v. Kan. City S. Ry. Co.,* 635 F.3d 796, 803 (5th Cir. 2011). The complaint must establish that "federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Empire Healthchoice Assurance, Inc. v. McVeigh,* 547 U.S. 677, 690 (2006); *Borden v. Allstate Ins. Co.,* 589 F.3d 168, 172 (5th Cir. 2009). Federal question jurisdiction, however, does not arise from the "mere presence of a federal issue in a state cause of action." *Merrell Dow Pharms., Inc. v. Thompson,* 478 U.S. 804, 813 (1986); *see also Singh v. Duane Morris, LLP*, 538 F.3d 334, 338 (5th Cir. 2008). The Supreme Court has not "treated 'federal issue' as a password opening federal courts to any state action embracing a point of federal law." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.,* 545 U.S. 308, 314 (2005). Rather, the Supreme Court has "confined federal-question jurisdiction over state-law claims to those that really and substantially involve a dispute or controversy respecting the validity, construction or effect of federal law." *Id.* at 313 (internal quotation marks and brackets omitted).

Although the Supreme Court has not provided a "single, precise definition" of statutory "arising under" jurisdiction, *Merrell Dow,* 478 U.S. at 808, it has stated that "the question is, does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable,* 545 U.S. at 314. Based on *Grable,* the Fifth Circuit has set forth a four-factor test that must be satisfied to establish federal question jurisdiction when there is a federal issue present in a state law claim: (1) the resolution of the

4

federal issue is necessary for the resolution of the state law claim; (2) the federal issue is actually disputed; (3) the federal issue is substantial; and (4) federal jurisdiction will not disturb the balance of federal and state judicial responsibilities. *Singh,* 538 F.3d at 338.

In this case, Defendants are not asserting that federal law creates any of the causes of action. Instead, Defendants are asserting that the presence of federal issues in the state-created causes of action confers federal question jurisdiction. Specifically, Defendants contend that federal question jurisdiction exists because Plaintiff includes as an allegation in her negligence claim that Defendants had duties to her under the WARN Act and FLSA, and breached these duties. Defendants also argue that, because Plaintiff incorporates by reference all preceding paragraphs of her Complaint (which include those alleging negligence) into her fraud claim, her fraud claim also necessarily raises a federal issue that is actually disputed and substantial.

Having analyzed the four relevant factors set forth in *Singh*, *supra*, the Court concludes that the case should be remanded. The Court first considers whether the resolution of the federal issue is necessary for the resolution of the state law claims of negligence and fraud. While Defendants' alleged violation of duties under federal statutes may be an issue in the case, resolving those federal issues will not necessarily be dispositive of the entire case. State law negligence and fraud claims have been asserted in connection with Defendants' alleged failure to disclose to employees that the Dallas Facility was being closed, and even if Plaintiff is ultimately unable to demonstrate that a federal statute was violated, she may be able to show that Defendants were still negligent or engaged in fraud under Texas law. Therefore, resolving the federal issue is not necessary to resolution of the state law claims, and the Court concludes that the first analytical factor is not satisfied.

APP 119

Second, the Court looks to whether the federal issue is actually disputed.  While there is a dispute as to whether Defendants violated a federal statute, there is no dispute concerning the meaning of any federal statute.  Therefore, the nature of the disputed federal issue is not a pure legal issue like the one presented in *Grable*, *supra*, but a fact-intensive one like the issues presented in *Empire*, *supra*, where the Court found remand warranted.[2]  The Court finds that the second factor is not satisfied.

The third factor is whether the federal issue is substantial.  The Court finds that, while Congress has created a private cause of action under the FLSA and the WARN Act, this factor alone is not determinative since all four factors must be satisfied.  Further, the mere presence of an FLSA or WARN Act issue in a state law tort case does not automatically satisfy the substantiality prong of the requisite analysis.

The last factor is whether federal jurisdiction will disturb the balance of federal and state judicial responsibilities. The Court finds that, in this case, it would.  Plaintiff's lawsuit, while including allegations of duties arising under federal statutes, is a relatively common state tort action, and the state court is capable of determining whether a federal statute has been violated and whether such a violation proves that Defendants were negligent or engaged in fraud in

---

[2] Federal jurisdiction is favored in cases that present "a nearly 'pure issue of law' . . . 'that could be settled once and for all and thereafter would govern numerous . . . cases.'" *Empire Healthchoice,* 547 U.S. at 700 (quoting Richard H. Fallon, Jr., Daniel J. Meltzer, & Daniel L. Shapiro, Hart & Wechsler's The Federal Courts and the Federal System 65 (2005 Supp.)).  Conversely, federal jurisdiction is disfavored for cases that are "fact-bound and situation-specific" or which involve substantial questions of state as well as federal law, such as the instant case. *Id.* at 701.

APP 120

connection with disclosures they made, or failed to make, to employees at the Dallas Facility.[3]

The mere allegation that a federal statute has been violated is insufficient to create federal-

question jurisdiction, and no other basis of federal court jurisdiction has been argued in

Defendants' response to Plaintiff's waiver of her WARN Act claim.  *See Merrell Dow*, 478 U.S.

at 813 (noting the "long-settled understanding that the mere presence of a federal issue in a state

cause of action does not automatically confer federal-question jurisdiction.").

      For the above-stated reasons, the Court rejects Defendants' argument that federal

question jurisdiction is conferred on this Court by Plaintiff's inclusion of alleged duties under

the WARN Act and FLSA in Plaintiff's negligence claim, or by virtue of incorporating by

reference her negligence allegations into her fraud claim.  Accordingly, as only state law claims

remain, remand is required unless the Court concludes that the exercise of supplemental

jurisdiction is warranted in this case.

### B.      Supplemental Jurisdiction

      Defendants argue that the Court should retain supplemental jurisdiction over the

remaining state law claims under the statutory factors set forth in 28 U.S.C. § 1367(c), and the

common law factors outlined in *Carnegie-Mellon*, 484 U.S. at 350.  Having considered these

factors, the Court rejects Defendants' argument, and concludes that they weigh in favor of

remand.

      Section 1367(c) provides that a district court may decline to exercise supplemental

---

[3] Moreover, in considering the balance of federal and state judicial responsibilities, the Court notes that state and federal courts have concurrent jurisdiction over FLSA claims, *see* 29 U.S.C. § 216(b), and the Court has dismissed Plaintiff's WARN Act claim, both factors influencing the Court's decision to remand.

jurisdiction over a state law claim if:

> (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). The common law factors set out in *Carnegie-Mellon* include judicial economy, convenience, fairness, and comity. *Enochs v. Lampass County*, 641 F.3d 155, 159 (5th Cir. 2011); *see Carnegie-Mellon*, 484 U.S. at 350.

The Court finds that the statutory factors set forth in 28 U.S.C. § 1367(c), as well as the common law factors, weigh in favor of the Court declining to exercise supplemental jurisdiction over the remaining state law claims. This determination is in accord with "[t]he general rule . . . that a court should decline to exercise jurisdiction over remaining state-law claims when all the federal-law claims are eliminated before trial[.]" *Brookshire Bros. Holding, Inc. v. Dayco Prods., Inc.*, 554 F.3d 595, 602 (5th Cir. 2009). Furthermore, when the federal claims are dropped at an early stage of the litigation, the district court has a "powerful reason to choose not to continue to exercise jurisdiction." *Enochs*, 641 F.3d at 161 (quoting *Carnegie-Mellon*, 484 U.S. at 351). It is within the discretion of the district court to decide whether to retain jurisdiction over a case where all the federal claims have been eliminated and only state law claims remain. *Id.*; *see also Guzzino v. Felterman*, 191 F.3d 588, 595 (5th Cir. 1999) ("[W]e are mindful of the wide discretion vested in the trial court to order a remand of state claims on the heels of dismissal of federal claims.").

The Court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. §

APP 122

1367(c)(2).  The Court has not invested "a significant amount of judicial resources in the litigation," such that considerations of judicial economy and convenience weigh in favor of exercising supplemental jurisdiction over the state law claims.  *See id.*  This lawsuit has been pending in this Court for less than eight months.  This Court has not issued a scheduling order, and, to the Court's knowledge, the parties have not conducted any discovery.  The state law claims will necessarily dominate the litigation going forward.  *See id.* § 1367(c)(3).  And though the state law claims may not raise particularly novel or complex issues under Texas law, *see* 28 U.S.C. § 1367(c)(1), neither are they the simplest or most routine issues of Texas law.

The judicial economy inquiry primarily focuses on the amount of judicial resources that have been expended on the case up to the point of remand.  *See Enochs*, 641 F.3d at 159-60.  The only judicial resources expended thus far are those related to Defendants' motion to dismiss the WARN Act claim and Defendants' current challenge to remand.  The Court has not expended time or resources on the state law claims involved, and this factor weighs heavily in favor of remand.  With regard to convenience and fairness, nothing in the record suggests it would be less convenient or unfair to litigate the case in state court in Dallas, Texas.  As stated by the Fifth Circuit, "it [is] certainly fair to have [ ] the purely Texas state law claims heard in Texas state court[.]" *Id.* at 160.  In addition, as already noted, Plaintiff requested, in the alternative to repleading, that the Court remand her remaining state law claims in the event it dismissed her WARN Act claim, and Defendants did not voice any opposition to this request in their reply brief.  Nor did Defendants ask the Court to reconsider its ruling that, absent the filing of an amended complaint, "the Court will decline to exercise supplemental jurisdiction over the remaining state law claims, which will be remanded to state court." Mem. Op. and Ord. at 12

9

[Docket Entry #17]. Finally, the last factor, comity, weighs in favor of remand, as retaining jurisdiction would disrupt the balance of congressionally approved federal and state judicial responsibilities. *See id.* ("[C]omity demands that the important interests of federalism and comity be respected by federal courts, which are courts of limited jurisdiction and not as well equipped for determination of state law as are state courts.") (internal quotations and citation omitted).

After balancing the relevant statutory and common law factors, the Court concludes that the factors weigh in favor of remand. Accordingly, the Court declines to exercise supplemental jurisdiction over the remaining state law claims, and remands this action to state court.

## III. CONCLUSION

For the reasons stated above, and in the Court's July 13, 2016, Memorandum Opinion and Order [Docket Entry #17], Plaintiff's WARN Act claim is hereby **DISMISSED WITH PREJUDICE**, and this lawsuit is **REMANDED** to County Court at Law No. 3 in Dallas, Texas. The clerk of court shall effect the remand in accordance with the usual procedure.

**SO ORDERED.**

**August 12, 2016.**

**BARBARA M. G. LYNN**
**CHIEF JUDGE**

10